In the

# United States Court of Appeals

### For the Seventh Circuit

No. 10-2069

WELLS FARGO BANK,
NATIONAL ASSOCIATION,
as Trustee,

*Plaintiff-Appellant,*

*v.*

LAKE OF THE TORCHES ECONOMIC
DEVELOPMENT CORPORATION,

*Defendant-Appellee.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 3:09-cv-00768-rtr—**Rudolph T. Randa**, *Judge*.

ARGUED OCTOBER 20, 2010—DECIDED SEPTEMBER 6, 2011

Before FLAUM, RIPPLE and EVANS[*], *Circuit Judges*.

RIPPLE, *Circuit Judge*. Wells Fargo Bank, N.A. brought this action in the United States District Court for the

---

[*] Circuit Judge Evans died on August 10, 2011, and did not participate in the decision of this case, which is being resolved by a quorum of the panel under 28 U.S.C. § 46(d).

Western District of Wisconsin against Lake of the Torches Economic Development Corporation ("Lake of the Torches" or "the Corporation"), a tribal corporation wholly owned by a federally recognized Indian tribe. Acting in its capacity as trustee, Wells Fargo alleged that Lake of the Torches had breached a bond indenture and filed a motion seeking the appointment of a receiver to manage the trust security on behalf of the bondholder. The district court held that the indenture was void because it was a gaming facility management contract unapproved by the National Indian Gaming Commission ("NIGC" or "the Commission"). *See* 25 U.S.C. §§ 2710(d)(9), 2711(a)(1); 25 C.F.R. § 533.7. Reasoning that the waiver of the Corporation's sovereign immunity in the indenture was consequently also void, the district court dismissed the case for lack of subject matter jurisdiction. Wells Fargo then filed motions to alter or amend the judgment and for leave to file an amended complaint to assert claims on its own behalf and on behalf of the bondholder. The court denied both motions, and Wells Fargo appealed.

We agree with the district court that the indenture constitutes an unapproved management contract within the meaning of the statute and is therefore void. Consequently, Lake of the Torches' waiver of sovereign immunity contained in that document is also void and cannot serve as a predicate for the district court's jurisdiction. We further believe that the district court prematurely denied Wells Fargo's motion to file an amended complaint asserting claims for legal and equitable relief in connection with the bond transaction. Assuming

that Wells Fargo has standing to assert the claims of the bondholder, it is an open issue whether other documents connected to the bond offering, exclusive of the indenture, evince an intent on the part of the Corporation to waive sovereign immunity with respect to claims in connection with the bond offering filed by Wells Fargo on behalf of the bondholder or on its own behalf. Accordingly, we affirm in part and reverse in part the judgment of the district court.

# I

## BACKGROUND

### A.

Because the task before us is primarily one of statutory and regulatory interpretation, we begin by setting forth the basic statutory and regulatory framework established by Congress and by NIGC, the agency acting under the authority of the governing statute.

During the 1970s and 1980s, many Native American tribes began to take advantage of their exemptions from certain state regulatory laws to conduct gaming operations on tribal land, thereby providing a much-needed source of revenue for the tribes and their members. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 218-20 & n.21 (1987). Many states had serious concerns about the rise of Indian gaming establishments, however, and Congress attempted to develop a compromise that would limit federal or state intervention into the sovereignty of Indian tribes while furthering legitimate state

policy goals regulating or prohibiting gambling. *See* S. Rep. No. 100-446, at 1-6 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3071-76.

At the same time, many members of Congress expressed concern about the private gaming management companies that often contracted with Indian tribes to develop and operate gaming facilities on tribal land. In the view of these lawmakers, these management companies posed two concerns: first, that they would take advantage of the tribes and bilk them out of gambling revenues and, second, that they would allow organized crime to infiltrate Indian gaming operations.

In addition, many federal courts had held that management contracts related to tribal land required approval from the Secretary of the Interior under 25 U.S.C. § 81.[1] *See*

---

[1] At the time, section 81 provided, in relevant part:

No agreement shall be made by any person with any tribe of Indians, or individual Indians not citizens of the United States, for the payment or delivery of any money or other thing of value, in present or in prospective, or for the granting or procuring any privilege to him, or any other person in consideration of services for said Indians *relative to their lands,* . . . unless such contract or agreement be executed and approved [by the Secretary of the Interior and the Commissioner of Indian Affairs].

*Wisconsin Winnebago Bus. Comm. v. Koberstein*, 762 F.2d 613, 615 (7th Cir. 1985) (quoting 25 U.S.C. § 81) (emphasis added). In

(continued...)

*United States ex rel. Mosay v. Buffalo Bros. Mgmt., Inc.*, 20 F.3d 739, 740 (7th Cir. 1994). The Secretary, however, lacked clear statutory standards to apply in evaluating management agreements. *See* 25 U.S.C. § 2701(2) (finding that "[f]ederal courts have held that section 81 of this title requires Secretarial review of management contracts dealing with Indian gaming, but does not provide standards for approval of such contracts"). Congress again sought to develop a solution that would protect tribes from unscrupulous contractors and criminals but would not unnecessarily interfere with the tribes' sovereignty or economic self-sufficiency.[2]

In 1988, Congress addressed these issues by enacting the Indian Gaming Regulatory Act ("the IGRA" or "the Act"). Pub. L. No. 100-497, 102 Stat. 2467 (codified at 25 U.S.C. §§ 2701 to 2721). Its stated goals were to create a comprehensive regulatory framework "for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong

---

[1] (...continued)

2000, Congress amended § 81. *See* Pub. L. No. 106-179, § 2. It now reads: "No agreement or contract with an Indian tribe that encumbers Indian lands for a period of 7 or more years shall be valid unless that agreement or contract bears the approval of the Secretary of the Interior or a designee of the Secretary." 25 U.S.C. § 81(b).

[2] *See generally* Franklin Ducheneaux, *The Indian Gaming Regulatory Act: Background and Legislative History*, 42 Ariz. St. L.J. 99 (2010) (describing congressional concerns regarding management contractors).

tribal governments," to "shield [tribes] from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players." 25 U.S.C. § 2702(1)-(2).

The Act, which represents the fulfillment of many years of congressional compromise over Indian gaming, *see* S. Rep. No. 100-446, at 1-2, divides gaming operations into three classes and imposes different regulatory requirements on each.

First, "class I gaming," which refers to social games conducted for minimal value and traditional Indian games connected to tribal ceremonies, 25 U.S.C. § 2703(6), is left entirely "within the exclusive jurisdiction of the Indian tribes" and remains unregulated by state or federal law. *Id.* § 2710(a)(1).

Second, "class II gaming," which encompasses bingo, lotteries and card games in which gamblers play against one another rather than against the house (poker, for example), *see id.* § 2703(7), is subject to a more extensive set of conditions and regulations. It is permitted only on tribal lands in states that do not entirely prohibit such gaming and only where the tribal resolution authorizing the operation is approved by the Chairman of the Commission. *Id.* § 2710(b)(1)(A)-(B). The Chairman's approval is contingent on the resolution's satisfaction of several conditions, including that it vests the sole proprietary interest in the operation in the tribe, that it sets up auditing systems and that it prohibits the

tribe from spending profits other than for certain, enumerated purposes. *Id.* § 2710(b)(2).

Finally, "class III gaming," which includes all other types of gambling, *id.* § 2703(8), regulates such activities as casino games played against the house (e.g., blackjack and roulette), slot machines and pari-mutuel betting (e.g., horse racing). Class III gaming is permitted only if it is "conducted in conformance with a Tribal-State compact entered into by the Indian tribe and the State" in which the tribal lands are located. *Id.* § 2710(d)(1)(C); *see also Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 48-50 (1996) (describing the tribal-state compact scheme).

The Act vests in the Commission the power to promulgate regulations. 25 U.S.C. § 2706(b)(10). In addition, it provides the Chairman of the Commission with the authority to review and approve management contracts entered into by an Indian tribe "for the operation and management," *id.* § 2711(a)(1), of a class II or class III gaming facility. *See id.* §§ 2710(d)(9), 2711(a)(1).[3] Under Commission regulations, unapproved management con-

---

[3] 25 U.S.C. § 2710(d)(9) provides that "[a]n Indian tribe may enter into a management contract for the operation of a class III gaming activity if such contract has been submitted to, and approved by, the Chairman." 25 U.S.C. § 2711(a)(1) provides that, "[s]ubject to the approval of the Chairman, an Indian tribe may enter into a management contract for the operation and management of a class II gaming activity."

tracts "are void." 25 C.F.R. § 533.7.[4] The Chairman's review of management contracts is subject to standards set out in the Act and in regulations promulgated by the Commission. Those standards include background checks of those involved with the management contractor, provisions setting out responsibility over the operations of the facility and substantive limits on the duration of the contract and the amount of compensation the management contractor may receive for its services. *See* 25 U.S.C. § 2711; 25 C.F.R. §§ 531, 533, 537.

**B.**

Lake of the Torches is a corporation chartered under tribal law by the Lac du Flambeau Band of Lake Superior Chippewa Indians ("the Tribe") to own and operate the Lake of the Torches Resort Casino ("the Casino"). The Casino is a class II and class III gaming facility located on tribal lands in northern Wisconsin and is operated pursuant to a tribal-state compact with the State of Wisconsin.[5]

---

[4] 25 C.F.R. § 533.7 provides: "Management contracts and changes in persons with a financial interest in or management responsibility for a management contract, that have not been approved by the Chairman in accordance with the requirements of part 531 of this chapter and this part, are void."

[5] The Commission approved a tribal ordinance authorizing Lake of the Torches to conduct class II and class III gaming on tribal lands. Letter from Anthony J. Hope, NIGC Chairman, to

(continued...)

Several years ago, the Tribe decided to diversify its operations by investing in a project to build a riverboat casino, hotel and bed and breakfast in Natchez, Mississippi. In order to secure funding for that investment and to refinance $27.8 million of existing debt, Lake of the Torches issued $50 million in taxable gaming revenue bonds. The bonds, which were secured by the revenues and related assets of the Casino,[6] were accompanied by

---

[5] (...continued)

Tom Maulson, Tribe President (Nov. 29, 1993), *available at* http://www.nigc.gov/Portals/0/NIGC%20Uploads/Reading Room/gamingordinances/lcdflmbbndlksuporchpwaind/ordap pr112993.pdf. In 1992, the Tribe entered into a compact with the State of Wisconsin to conduct class III gaming at the Casino. *See* Amendments to the Lac du Flambeau Band of Lake Superior Chippewa Indians and the State of Wisconsin Gaming Compact of 1992 (Dec. 18, 1998), *available at* http://www.nigc.gov/Portals/0/NIGC%20Uploads/readingroom/ compacts/Lac%20du%20Flambeau%20Band%20of%20Lake%20 Superior%20Chippewa%20Indians/lacduflambeaucomp021199. pdf.

[6] Specifically, the security interest includes:

    (a) the "Pledged Revenues" as defined in the Indenture;

    (b) the Corporation's accounts, deposit accounts, general intangibles, chattel paper, instruments and investment property whether now owned or hereafter acquired and the proceeds of each of the foregoing and all books, records and files relating to all or any portion of the Collateral;

(continued...)

a trust indenture ("the Indenture") naming Wells Fargo as trustee. The Indenture set forth several present and contingent provisions that vested in Wells Fargo and the bondholder the power to ensure that Lake of the Torches satisfied its repayment obligations and that Casino revenues would be sufficient to repay the bonds. Under the terms of the Indenture, Wells Fargo assumed oversight of Casino revenues, which Lake of the Torches was required to place into a deposit account controlled by Wells Fargo. Wells Fargo would use the funds in the account to repay the bondholders according to the repayment schedule. When Lake of the Torches required funds to pay its operating expenses, it could certify its need to Wells Fargo and withdraw necessary amounts from the account.

Because federally recognized Indian tribes are sovereign entities, they are immune from suit absent waiver or congressional abrogation. *See Kiowa Tribe of Oklahoma v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998) ("As a matter of federal law, an Indian tribe is subject to

---

[6] (...continued)

    (c)  the Equipment;

    (d) all improvements, accessions, appurtenances, substitutions and replacements to the Equipment, insurance proceeds and condemnation awards payable therefrom; and

    (e)  all proceeds and products of (a), (b), (c) and (d) and all rights thereto[.]

R.29-1 at 2-3.

suit only where Congress has authorized the suit or the tribe has waived its immunity."); *Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 928 (7th Cir. 2008).[7] Therefore, in the Indenture, Lake of the Torches agreed to a limited waiver of its sovereign immunity for suits connected to the bonds, the Indenture, the corporate resolution authorizing issuance of the bonds ("the Bond Resolution") and related documents (collectively, "the Bond Documents"). Lake of the Torches also made multiple representations—directly and through counsel—that none of the bond documents "constitute[d] a 'management contract' or an agreement that is a 'collateral agreement' to a management contract that relates to a gaming activity regulated by IGRA pursuant to 25 U.S.C. § 2711." R.29-6 at 9.

In January 2008, a single purchaser, Saybrook Capital LLC, purchased the bonds for $50 million. The bonds carry an interest rate of 12% and are slated to mature on October 1, 2012. R.50-3 at 3.

---

[7] The parties do not dispute that, although Lake of the Torches is a corporation operating as a commercial entity, it partakes of the Tribe's immunity from suit. We therefore do not address the issue. We note that the tribal document incorporating Lake of the Torches does not waive sovereign immunity and that the parties' assumption is compatible with the general assumption prevailing among courts and commentators. *See, e.g.*, *Allen v. Gold Country Casino*, 464 F.3d 1044, 1046-47 (9th Cir. 2006); *Cohen's Handbook of Federal Indian Law* §§ 7.05[1], 21.02[2] (2005 ed.) (discussing tribal sovereign immunity).

The Natchez investment proved to be less successful than originally hoped, leaving the Tribe unenthusiastic about its bond obligations. According to the complaint, in October 2009, the Tribe elected a new governing council that had campaigned on a pledge to repudiate the bonds. Shortly thereafter, Tribe officials requested that Wells Fargo transfer $4,750,000 held in the deposit account to Lake of the Torches, ostensibly for operating expenses. After Wells Fargo made the transfer, however, it determined that Lake of the Torches had misrepresented its need for the funds. Wells Fargo therefore requested confirmation from Lake of the Torches that the money was required to pay operating expenses, but Lake of the Torches failed to respond and then stopped depositing Casino revenue in the trust account. Lake of the Torches since has repudiated its obligations under the bonds and refuses to repay the $46,615,000 remaining principal or the interest owed to Saybrook. *See* R.50-1 at 18-19; R.50-9 at 2.

## C.

On December 21, 2009, Wells Fargo filed this action against Lake of the Torches for breach of the Indenture. Wells Fargo also filed an emergency motion requesting that the court appoint, pursuant to Federal Rule of Civil Procedure 66 and the terms of the Indenture, a temporary receiver over the Casino revenues and other assets pledged as security for the bonds. After preliminary briefing on the emergency motion, the district court scheduled an evidentiary hearing for January 6, 2010. The

day before that scheduled hearing, the assigned district judge recused herself and another district judge was assigned to the case. That same day, the newly assigned district judge canceled the evidentiary hearing and substituted for it a telephone status conference. Before the status conference, however, the district court entered a *sua sponte* order dismissing the case for lack of jurisdiction. *See* R.43.

In a written opinion issued five days later, the district court explained its determination. *See Wells Fargo Bank, N.A. v. Lake of the Torches Econ. Dev. Corp.*, 677 F. Supp. 2d 1056 (W.D. Wis. 2010). The court held that the Indenture was a management contract within the meaning of the Act and that, because it was unapproved by the Chairman of the NIGC, it was void. *Id.* at 1057.

The district court based its determination on several provisions of the Indenture, evaluated in light of Commission regulations. The court first explained that the Commission defines a management contract as "any contract, subcontract, or collateral agreement between an Indian tribe and a contractor or between a contractor and a subcontractor if such contract or agreement provides for the management of *all or part* of a gaming operation," *id.* at 1059 (quoting 25 C.F.R. § 502.15) (emphasis added), and a "primary management official" as one with the "authority to 'set up working policy for the gaming operation,'" *id.* (quoting 25 C.F.R. § 502.19(b)(2)). The court determined that "the regulations demonstrate that a 'necessary condition for a management contract is that it grant to a party other

than the tribe some authority with regard to a gaming operation.'" *Id.* (quoting *Machal, Inc. v. Jena Band of Choctaw Indians*, 387 F. Supp. 2d 659, 665 (W.D. La. 2005)).

With this framework in place, the district court examined the Indenture and determined that several of its provisions provide Wells Fargo and Saybrook with significant authority to set up working policy for the Casino's operations. Specifically, the Indenture grants a security interest in the Casino's gross revenues; prohibits Lake of the Torches from making capital expenditures beyond a certain limit without bondholder approval; provides for the appointment of a management consultant if Lake of the Torches fails to meet a specified debt-service ratio and requires Lake of the Torches to use its best efforts to implement the consultant's recommendations; limits Lake of the Torches' ability to replace or remove certain key management personnel without bondholder consent; gives bondholders the right upon default to require that Lake of the Torches replace management personnel; and permits Wells Fargo to seek the appointment of a receiver of the trust estate upon default. *See id.* at 1059-60.

The district court held that these restrictions on the Corporation "give the bondholders the opportunity to exert significant control over the management operations of the Casino Facility." *Id.* at 1060. Additionally, the court determined that the provision for appointing a receiver over Casino revenues would allow the receiver to "exert[] a form of managerial control since those monies could

not be used for other purposes related to the operation of the Casino Facility." *Id.*

Accordingly, the court determined that the Indenture was a management contract. Because unapproved management contracts are void, the waiver of sovereign immunity contained in the Indenture also was void and the district court was without jurisdiction. Consequently, it dismissed the case. *See id.* at 1061.

The district court also rejected Wells Fargo's contention that the waiver provision could be severed from the rest of the Indenture and that Lake of the Torches should be estopped from challenging the validity of the Indenture because of its representations in the Bond Resolution that the Indenture was not a management contract. According to the court, Wells Fargo's reliance on Lake of the Torches' representations was "completely unreasonable." *Id.* at 1062.

Wells Fargo moved to alter or amend the judgment and for leave to file an amended complaint to assert claims under the other bond documents. The district court denied both motions. *See Wells Fargo Bank, N.A. v. Lake of the Torches Econ. Dev. Corp.*, No. 09-CV-768, 2010 WL 1687877 (W.D. Wis. Apr. 23, 2010). First, the district court rejected Wells Fargo's claim that the court should not have dismissed the case without the submission of a motion to do so from Lake of the Torches and should not have relied on evidence outside the complaint—specifically, an affidavit from Dean Kevin Washburn, an

expert witness retained by Lake of the Torches.[8] According to the court, although its "*sua sponte* dismissal was unconventional," it was "a legal ruling based upon undisputed facts," and its reliance on the expert's affidavit "was merely persuasive legal authority." *Id.* at *3. In addition, the court's sudden decision to dismiss the case (one day after the judge was assigned) was justified because the issue "was brought squarely and immediately before the [c]ourt in the context of Wells Fargo's emergency request to appoint a receiver." *Id.* at *4.

Second, the district court refused to sever the terms in the Indenture that provided for management of the Casino; it took the view that "the management provisions cannot be severed without defeating the primary purpose of the bargain." *Id.* at *3.

Finally, the court determined that any amendment to the complaint would be futile. Even if Wells Fargo filed a new complaint amended to include claims under the Bond Documents (including the bonds and the Bond Resolution, which, Wells Fargo asserted, also waived sovereign immunity), that complaint would fail because the Bond Documents are "collateral agreements" within the meaning of Commission regulations and, in the view of the district court, are therefore also void. *Id.* at *6.

---

[8] Dean Washburn is former general counsel of the Commission and is now the dean of the University of New Mexico School of Law. He is at present unaffiliated with the Commission and was retained by Lake of the Torches to submit the affidavit.

Relying on statements by the Commission and by Dean Washburn, as well as a decision of the Court of Appeals for the Second Circuit, Wells Fargo had contended that collateral agreements are void only if they provide for the management of a gaming operation. The district court rejected that view and concluded that "failure to procure NIGC approval in the first instance renders all of the collateral agreements void *ab initio*." *Id.*

## II

## DISCUSSION

In this appeal, Wells Fargo submits that the Indenture is not a management contract and that, even if it is, the offending provisions should be severed from the remainder of the Indenture. Moreover, Wells Fargo challenges the procedure under which the district court dismissed its suit and asserts that amendment to state other claims for legal and equitable relief would not have been futile because the remaining Bond Documents were not void for failure to procure the Chairman's approval.

We review a dismissal for lack of subject matter jurisdiction de novo. *Estrada v. Holder*, 604 F.3d 402, 408 (7th Cir. 2010); *Ho-Chunk Nation*, 512 F.3d at 929. The district court's denial of Wells Fargo's motions to vacate the judgment and for leave to file an amended complaint is reviewed for an abuse of discretion. *Sound of Music Co. v. Minnesota Mining & Mfg. Co.*, 477 F.3d 910, 922 (7th Cir. 2007).

**A.**

Before assessing Wells Fargo's submissions, we must determine whether the district court properly possessed jurisdiction over Wells Fargo's suit for breach of the Indenture. The district court's jurisdiction rested on the statute giving it jurisdiction over suits in which the amount in controversy exceeds $75,000 and in which the parties are of diverse citizenship. *See* 28 U.S.C. § 1332. In its complaint, Wells Fargo stated that its principal place of business is in South Dakota, that Lake of the Torches is a citizen of Wisconsin and that the amount in controversy exceeded $75,000.

One of these assertions requires close scrutiny. Specifically, we must determine whether Lake of the Torches, a tribal corporation, ought to be considered a citizen of a state under the diversity statute. Although neither the Supreme Court nor this court has addressed the issue previously, most courts agree that Indian tribes are not citizens of any state for purposes of the diversity statute and therefore may not sue or be sued in federal court under § 1332. *See Miccosukee Tribe of Indians of Florida v. Kraus-Anderson Constr. Co.*, 607 F.3d 1268, 1276 (11th Cir. 2010), *cert. denied*, No. 10-717, 2011 WL 2437056 (U.S. June 20, 2011).[9] We previously have entertained

---

[9]  *See also, e.g., Cook v. AVI Casino Enters., Inc.*, 548 F.3d 718, 722 (9th Cir. 2008); *Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 27 (1st Cir. 2000); *Romanella v. Hayward*, 114 F.3d 15, 16 (2d Cir. 1997) (per curiam); *Gaines*
(continued...)

a diversity suit involving a tribal corporation as a party, *see Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803 (7th Cir. 1993), but we have not stated expressly that corporations chartered under tribal law are citizens of a state for purposes of invoking diversity jurisdiction.

Our colleagues in the Eighth Circuit have held that an unincorporated school board operated by an Indian tribe and "considered a part of the Indian tribe" is not a citizen of a state. *Auto-Owners Ins. Co. v. Tribal Court of the Spirit Lake Indian Reservation*, 495 F.3d 1017, 1021 (8th Cir. 2007). However, on the precise point now before us, both the Ninth and Tenth Circuits have held that "an entity incorporated under tribal law is the equivalent of a corporation created under state or federal law for diversity purposes" and therefore "should be analyzed for diversity jurisdiction purposes as if it were a state or federal corporation." *Cook v. AVI Casino Enters., Inc.*, 548 F.3d 718, 723 (9th Cir. 2008) (internal quotation marks omitted); *see also Gaines v. Ski Apache*, 8 F.3d 726, 729 (10th Cir. 1993) (explaining that a "tribe may . . . charter a corporation pursuant to its own tribal laws, and such a

---

(...continued)

*v. Ski Apache*, 8 F.3d 726, 729 (10th Cir. 1993). *See generally* 13E Charles Alan Wright et al., *Federal Practice and Procedure* § 3622 (3d ed. 2011) ("The existing judicial authority indicates that an Indian tribe, as opposed to an individual member thereof, is not a citizen of any state and is not a foreign state for diversity or alienage jurisdiction purposes, although some cases take the contrary position with regard to entities created by a Tribe." (footnote omitted)).

corporation will be considered a citizen of a state for purposes of diversity jurisdiction"); *Stock West, Inc. v. Confederated Tribes of the Colville Reservation*, 873 F.2d 1221, 1226 (9th Cir. 1989). Relatedly, in holding that a tribal housing agency was a stateless entity under the diversity statute, the First Circuit indicated that the result would have been different had the housing authority been a corporation: "We see no reason why the Authority (an arm of the Tribe, *not separately incorporated*) should be treated any differently for jurisdictional purposes." *Ninigret Dev. Corp. v. Narragansett Indian Wetuomuck Hous. Auth.*, 207 F.3d 21, 27 (1st Cir. 2000) (emphasis added); *cf. Miccosukee Tribe of Indians of Florida*, 607 F.3d at 1276 (stating that the "majority view . . . is that *unincorporated* Indian tribes cannot sue or be sued in diversity" (emphasis added) (quotation marks omitted)).

We have hewn to the mechanical application of a clear rule "treat[ing] any corporation as a corporation for diversity purposes" and have noted that the diversity statute itself does not distinguish between types of corporations or limit its reach to businesses incorporated under state law. *Hoagland v. Sandberg, Phoenix & Von Gontard, P.C.*, 385 F.3d 737, 739, 741 (7th Cir. 2004); *see also Empress Casino Joliet Corp. v. Balmoral Racing Club, Inc.*, No. 09-3975, 2011 WL 2652201, at *3 (7th Cir. July 8, 2011) (en banc) (reaffirming a preference for "administrative simplicity" in jurisdictional rules (quotation marks omitted)). Indeed, municipal corporations chartered by states are "treated just like . . . regular business corporation[s]" under § 1332. *City of Clinton v. Moffitt*, 812 F.2d 341, 342 (7th Cir. 1987) (citing *Moor v. Cnty. of*

*Alameda*, 411 U.S. 693, 717-18 (1973), and *Illinois v. City of Milwaukee*, 406 U.S. 91, 97 (1972)). Moreover, we do not discern any significant reason that corporations organized under tribal law and participating in economic transactions with individuals and businesses from a variety of states merit different jurisdictional treatment than their counterparts organized under state law. Thus, we join our colleagues in the Ninth and Tenth Circuits and hold that a corporation chartered under Native American tribal law should be treated as a citizen of a state pursuant to § 1332(c). *Cf. Hoagland*, 385 F.3d at 740 (citing with approval cases treating tribal corporations as state citizens for diversity purposes). We understand the Eighth Circuit's decision to apply only to *unincorporated* tribal agencies. *Cf. Auto-Owners Ins. Co.*, 495 F.3d at 1021 (quoting *Dillon v. Yankton Sioux Tribe Hous. Auth.*, 144 F.3d 581, 583 (8th Cir. 1998), as distinguishing between a tribal agency and "'a separate corporate entity created by the tribe'"). In this case, then, Lake of the Torches may be considered a citizen of Wisconsin, and the district court properly exercised jurisdiction under § 1332.

**B.**

The primary issue presented by this appeal is whether the Indenture, which governs the terms of a bond offering, is a management contract for the operation of a gaming facility within the meaning of the Act. Wells Fargo asserts that because the Indenture is essentially a loan document containing "typical provisions

used by lenders to ensure they can be paid from, and have recourse to, revenue streams and collateral sufficient to repay their loan," it is not a contract for the management or operation of the Casino and therefore lies outside the scope of the Act's regulation of management contracts. Appellant's Br. 24.

### 1.

Resolution of this issue is, fundamentally, a question of statutory interpretation. Therefore, we must begin with the language of the Act. Sections 2710 and 2711, respectively, permit Indian tribes to "enter into a management contract for the operation of a Class III gaming activity" or to "enter into a management contract for the operation and management of a class II gaming activity," only if the contract has been submitted to and approved by the Chairman of the Commission. 25 U.S.C. §§ 2710(d)(9), 2711(a)(1).

Notably, the Act does not define "management contract." In determining its meaning, however, we cannot limit ourselves to the isolated words of the statutory text. Statutory language "must always be read in its proper context," *McCarthy v. Bronson*, 500 U.S. 136, 139 (1991), because "[t]he meaning—or ambiguity—of certain words or phrases may only become evident when placed in context," *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000). Accordingly, we must examine the "language and design of the statute as a whole." *United States v. Berkos*, 543 F.3d 392, 396 (7th Cir. 2008); *see also Foufas v. Dru*, 319 F.3d 284, 287 (7th Cir.

2003) ("To read language acontextually is an almost certain route to error.").

In undertaking such a contextual study of the Act's provisions, we begin by recalling Congress's statement of legislative purpose. As we noted in our prefatory description of the Act, Congress enacted this legislation to provide a comprehensive regulatory framework for gaming operations by Indian tribes that would promote tribal economic self-sufficiency and strong tribal governments while shielding them from organized crime and other corrupting influences. Congress explicitly expressed a concern that Indian tribes be the primary beneficiaries of fair and honest gaming operations. *See* 25 U.S.C. § 2702(1)-(2). When we turn to the specific provisions governing the content of management contracts, we find that Congress attempted to implement these legislative goals by conditioning, through § 2711(b), the Chairman's approval of a management contract on the inclusion in the contract of several provisions designed to protect the interests of the Indian tribe. For example, the contract must provide "for adequate accounting procedures" and "verifiable financial reports . . . prepared, by or for the tribal governing body." 25 U.S.C. § 2711(b)(1). The contract also must allow tribal officials to have "access to the daily operations [and] . . . to verify the daily gross revenues and income" of the gaming facility. *Id.* § 2711(b)(2). In addition, the contract must provide "for a minimum guaranteed payment to the Indian tribe that has preference over the retirement of development and construction costs," *id.* § 2711(b)(3), and it must specify "an agreed ceiling

for the repayment of development and construction costs." *Id.* § 2711(b)(4). The contract cannot last more than five years unless the Chairman determines "that the capital investment required, and the income projections, for the particular gaming activity require the additional time." *Id.* § 2711(b)(5). Finally, the contract must set out "grounds and mechanisms" by which it may be terminated. *Id.* § 2711(b)(6).

The IGRA also governs the fee that the outside party may receive for its services under the contract. The Chairman may approve management contracts "providing for a fee based upon a percentage of the net revenues of a tribal gaming activity" only if the Chairman believes the percentage is "reasonable in light of surrounding circumstances" and usually only if the percentage is not more than 30%. *Id.* § 2711(c)(1). If, however, "the capital investment required" by the contractor and the projected return require a larger fee, the Chairman may approve a fee between 30% and 40% of net revenues. *Id.* § 2711(c)(2).

These statutory provisions do not offer a precise answer to the question before us—whether Congress intended to include contracts with third parties whose primary, or only, role is to infuse capital into a gambling operation and whose primary interest in participation in management matters is the protection of its investment. Some of the statutory provisions are crafted seemingly to include a very broad range of business arrangements, including the one before us. Other provisions appear aimed at more traditional management

relationships in which the third party operates, for a fee, the day-to-day staffing and supervision of the games, other offerings and security at the gaming facility. An examination of the statutory provisions simply yields no definitive answer with respect to the breadth of the term "management contract." It does, however, make clear that Congress wrote in broad strokes in crafting this legislation. There is no solid indication, in either the language or the structure of the statute, that Congress intended to limit its regulation of third-party contractual participation in Indian enterprises to a particular kind of activity.

When we turn to the pronouncements of the NIGC, we find the same broad approach to regulation. The Commission has defined the term "management contract" by regulation as "any contract, subcontract, or collateral agreement between an Indian tribe and a contractor or between a contractor and a subcontractor if such contract or agreement provides for the management of *all or part* of a gaming operation." 25 C.F.R. § 502.15 (emphasis added). Notably, this regulatory provision includes "collateral agreements," a term that the agency has interpreted to include land purchase agreements and development and construction agreements when those agreements "provide[] for the management of all or part of a gaming operation," *id.*[10] *See Catskill Dev., L.L.C.*

---

[10] The Commission defines a "collateral agreement" as "any contract . . . that is related, either directly or indirectly, to a
(continued...)

*v. Park Place Entm't Corp.*, 547 F.3d 115, 130-32 (2d Cir. 2008) (discussing regulatory provisions and deferring to the NIGC's decision that a land purchase agreement and a development and construction agreement should be characterized as management contracts); *United States ex rel. Bernard v. Casino Magic Corp.*, 293 F.3d 419, 424-25 (8th Cir. 2002) (deferring to the NIGC's view that a construction term loan agreement and a consulting contract, when read together, formed a management agreement). Other provisions of tangential relevance are similarly broad.[11]

---

[10] (...continued)

management contract, or to any rights, duties or obligations created between a tribe (or any of its members, entities, or organizations) and a management contractor or subcontractor (or any person or entity related to a management contractor or subcontractor)." 25 C.F.R. § 502.5.

[11] As the district court noted, the Commission defines the term "primary management official" as

> (a) The person having management responsibility for a management contract;
>
> (b) Any person who has authority:
>
> (1) To hire and fire employees; or
>
> (2) To set up working policy for the gaming operation; or
>
> (c) The chief financial officer or other person who has financial management responsibility.
>
> (d) Any other person designated by the tribe as a primary management official.

(continued...)

In an informal NIGC bulletin distinguishing between management contracts, which require approval, and consulting agreements, which do not, the Commission had taken a similarly broad approach in defining a management contract for the purposes of the Act:

> Management encompasses many activities (e.g., planning, organizing, directing, coordinating, and controlling). The performance of any one of such activities with respect to all or part of a gaming operation constitutes management for the purpose of determining whether any contract or agreement for the performance of such activities is a management contract that requires approval.

NIGC Bulletin No. 94-5, at 1 (Oct. 14, 1994). This informal agency pronouncement, while not entitled to deference under the Supreme Court's decision in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984),[12] is of relevance to our inquiry. The Bulletin follows the same approach as the regulations and demonstrates a consistent view on the part of the agency that,

---

[11] (...continued)
25 C.F.R. § 502.19. The Commission defines "person having management responsibility for a management contract" as "the person designated by the management contract as having management responsibility for the gaming operation, or a portion thereof." *Id.* § 502.18.

[12] *See United States v. Mead Corp.*, 533 U.S. 218, 226-27, 231 (2001); *Catskill Dev., L.L.C. v. Park Place Entm't Corp.*, 547 F.3d 115, 127 (2d Cir. 2008); *First American Kickapoo Operations, L.L.C. v. Multimedia Games, Inc.*, 412 F.3d 1166, 1174 (10th Cir. 2005).

although determinations "must be made on a case-by-case basis because they depend on the facts and circumstances of the individual situation and the actual day-to-day relationship between the tribe and the contractor," NIGC Bulletin No. 94-5, at 2, the governing statute requires careful scrutiny of a variety of arrangements that result in the ongoing control of gaming operations by non-tribe entities.

Another source of informal agency pronouncement, informal declination letters from NIGC's Acting General Counsel, speak more directly to the precise problem before us. We approach this source with significant caution, however. The declination process, by which entities may seek the view of the General Counsel as to whether a particular contract is a management contract requiring the review of the Chairman, is neither contemplated by the statute nor authorized by regulation. Nor do we discern any indication that the views of the General Counsel are scrutinized formally by the Chairman or by the NIGC. Nevertheless, because they embody the considered view of an officer whose responsibilities include the application of the statute and the regulations, the letters cannot be excluded entirely from our consideration.

Our review of these documents reveals the same pattern discernible in the statute and the regulations. There is a general concern that the participation of *any* party in the actual management of a tribal gaming facility—whether through a traditional contract to oversee the daily operations of the facility or through a

financing scheme that permits the provider of funding intermittently to interject itself in the management decisions of the facility to ensure the security of its investment—should be subject to the Chairman's scrutiny and approval as a management contact. Although the General Counsel's office has drawn more precise lines of demarcation than we find in other sources, it is not within the scope of our task today to approve or disapprove those distinctions.[13] Nevertheless, the letters do confirm our reading of the statutory and regulatory scheme as providing no particular exemption for financing arrangements that contain provisions that implicate the management of a gaming facility.

The absence of such an exemption ought not be surprising in light of the manifest legislative purpose of the statutory provision. As we have noted, Congress, intent on fostering and protecting tribal ownership of gaming facilities and concerned that third parties would take advantage of tribal entrepreneurial efforts, wrote in broad strokes to encompass many possible sources of abuse. Congress was in no position to identify specifically the "red flags" that would indicate the need for scrutiny, and it therefore, understandably, left to the agency charged with the responsibility for administration of the statute the task of delineating in more

---

[13] Indeed, it appears that, through its regulatory authority, the Commission should undertake that task at some point in order to give the entities that it regulates more certain guidance as to the permissible scope of financing agreements.

concrete terms which arrangements deserved scrutiny before implementation.

Unfortunately, we must resign ourselves to the fact that we do not have the definitive guidance from the Commission that Congress had anticipated. In the absence of such careful and comprehensive regulation by NIGC, we are left with the task of determining whether the provisions of this particular financial arrangement require the Chairman's scrutiny. In these circumstances, we must rely on the general standards outlined in the Act, the sparse regulatory provisions and, to the extent that they are informative, the informal pronouncements of the NIGC in order to ascertain whether the agreement before us is within the sphere of regulation established by Congress.

Upon examination of the Indenture Agreement, it becomes apparent that there are provisions that militate in favor of characterizing the document as a management contract and other provisions that support the contrary characterization. Supporting the latter characterization, it is notable that the Indenture does not transfer explicitly to Wells Fargo or to Saybrook, the bondholder, wholesale responsibility over the daily operations or maintenance of the Casino, let alone compensate them for doing so. Further, it makes no explicit provision for the transfer of responsibility over the Casino's employment, accounting or financial procedures. In fact, the Indenture requires Lake of the Torches to "continue to . . . operate . . .[,] maintain, repair and preserve the Casino Facility," to ensure that the operation

of the Casino complies with legal requirements and to pay operating expenses and taxes. R.6-1 at 41. The Indenture also contemplates that Lake of the Torches will maintain control over Casino licenses, permits, financial records, accounting records, budgetary statements, accounts payable and "all other documents, instruments, reports and records . . . relating to the operation of the Casino Facility." *Id.* at 39; *see also id.* at 39-40, 42. It does not involve provisions for development or construction costs, does not set a term limit for the transfer of rights (which will be extinguished upon repayment) and does not allocate to Saybrook or Wells Fargo a percentage of the Casino's revenues. The Indenture sets a fixed repayment schedule that, although secured by gaming revenues, is not set as a proportion of it.

On the other hand, there are provisions that are far more problematic. As we have noted, section 5 of the Indenture requires that gross revenues from the Casino be deposited daily in a trust fund, sets numerous conditions on the allocation and disposition of the revenues and gives Wells Fargo ultimate control over withdrawals. We need not determine here the appropriateness of such an arrangement other than to note that, without some limitation on Wells Fargo's discretion to allocate or condition the release of the Casino's gross revenues even to pay operating expenses, this provision bestows a great deal of authority in an entity other than the Tribe to control the Casino's operations. Furthermore, as the district court noted, section 6.18 of the Indenture provides that the Corporation cannot incur capital expenditures in excess of 25% of the previous year's

capital expenditures without the consent, which may not be "unreasonably withheld," of 51% of the bond-holders. *Id.* at 43. This provision allows the bondholders to control the amount that the Corporation can spend on capital expenditures related to the Casino, a major prerogative in determining the present and future direction of any corporate entity. Indeed, the NIGC has enumerated "[m]aintaining and improving the gaming facility" as the very first responsibility that must be allocated in any management contract. *See* 25 C.F.R. § 531.1(b)(1).

In addition, section 6.19 of the Indenture specifies that, if the debt-service-coverage ratio "falls below 2.00 to 1," the bondholders can require the Corporation to "promptly retain an Independent management con-sultant with sufficient experience in and knowledge of the gaming industry approved by the Bondholder Representative" to conduct a review of Casino operations and to submit a report making "recommendations as to improving the operations and cash flow of the Casino." R.6-1 at 43. This provision requires, further-more, that the Corporation "use its best efforts to imple-ment the recommendations" of the consultant within 90 days. *Id.* We agree with our colleague in the district court that this provision implicates the apportionment of management responsibilities for the Corporation. It permits the consultant, who must be approved by a representative of the bondholders, effectively to direct the operations of the Casino and thereby transfers man-agement responsibility over the gaming operation into the hands of a party other than the tribe. *Cf. United States*

*ex rel. Bernard*, 293 F.3d at 425 ("The issue is whether Casino Magic, in fact, had managerial *control*." (emphasis added)).

The Indenture further provides that the Corporation will not remove or permit the replacement of the Casino's general manager, controller or chairman or executive director of the gaming commission for any reason without the consent of 51% of the bondholders. R.6-1 at 44. This requirement applies to removal for *any* reason, thus potentially tying the hands of the Tribe to replace key officers even when sound management or even regulatory compliance concerns require their removal. This provision gives the bondholders truly powerful authority over the management of the Corporation and ensures that they will be able to exercise strong control over management and compliance issues that arise in the normal course of the Casino's operation.

The provisions that we have discussed to this point affect the day-to-day management of the Corporation when it is meeting its debt obligations. The Indenture permits, however, even greater control by the bondholders in the case of default. Specifically, the bondholders can require the Corporation to hire new management of its choosing. *Id.* at 49. As the district court held, this provision places very significant management authority in the hands of the bondholders.

We reiterate that we do not attempt here to delineate precise guidelines for parties to loan agreements involving an Indian gaming operation, a task better left to the Commission. Nevertheless, we are firmly convinced

that, taken together, the provisions discussed above transfer significant management responsibility to Wells Fargo and the bondholder and therefore render the Indenture a management agreement subject to the approval of the Chairman.[14]

## 2.

The district court took the view that, because the contract was a management contract under IGRA and had not been approved by the Chairman, it was void ab initio and that the offending provisions could not be severed. Wells Fargo, however, invites our attention to *Olson v. Paine, Webber, Jackson & Curtis, Inc.*, 806 F.2d 731 (7th Cir. 1986), in which we reformed an arbitration provision in an investment agreement in order to avoid its invalidation for violating Commodity Futures Trading

---

[14] The district court determined that the provision of the Indenture providing for the appointment of a court-appointed receiver to manage the trust security upon default also rendered the Indenture a management agreement under IGRA. Because we have determined that the provisions discussed in the text suffice to establish that the Indenture is a management contract, we need not determine whether the provision relating to the appointment of a receiver is similarly problematic. The reconciliation of the provisions of IGRA, section 959 of Title 28 of the United States Code and traditional federal equity practice need not be decided here and is best left to litigation where the matter has been explored by the parties more fully than it has been explored here.

Commission regulations despite a provision in the regulations providing that nonconforming agreements "will be null and void." *Id.* at 743 (quoting 41 Fed. Reg. 42944 (1976)). Wells Fargo also points to the Indenture's own severability clause, which provides that any illegal terms in the Indenture should be read out in order to preserve the remainder of the agreement. According to Wells Fargo, reformation of the Indenture would conform with both *Olson* and the intent of the parties as expressed in the severability clause.

We cannot accept this argument. As Wells Fargo readily admits, *see* Appellant's Br. 34, IGRA regulations provide explicitly that management contracts that have not been approved by the Chairman are void. 25 C.F.R. § 533.7.[15] The Act is comprehensive legislation reconciling many competing interests and fulfilling the federal government's special obligation to protect Native American tribes. *See Gaming World Int'l, Ltd. v. White Earth Band of Chippewa Indians*, 317 F.3d 840, 848 (8th Cir. 2003) ("The regulatory scope of IGRA is . . . far reaching in its supervisory power over Indian gaming contracts."). One of IGRA's principal purposes is to ensure that the tribes retain control of gaming facilities set up under the protection of IGRA and of the revenue from these facilities.

---

[15] Wells Fargo does not contend that this regulation is not entitled to *Chevron* deference as a reasonable interpretation of IGRA's requirement that parties may enter into management contracts only if they have been approved by the Chairman of the NIGC.

Consequently, the statute provides for pre-screening of contracts between the tribes and parties desiring to establish business relationships with the tribes that might impair this fundamental purpose of the federal statutory scheme, and it is this comprehensive review that constitutes the core of Congress's protection for Indian gaming establishments. The statutory and regulatory framework is thus fundamentally different from the simple omission of statutorily required terms at issue in *Olson* and incompatible with the presumption against total invalidity applied in that case. It was reasonable for the NIGC to determine that, in enacting the statute, Congress intended that a contract violating this fundamental purpose of the statute was void. Given the Commission's categorical statement about the consequences for failure to secure approval and the comprehensive regulatory framework involved, we conclude that the Commission's regulation is not subject to reformation by excision of offending provisions. *Cf. First American Kickapoo Operations, L.L.C. v. Multimedia Games, Inc.*, 412 F.3d 1166, 1177 n.5. (10th Cir. 2005) ("It may be questioned whether any part of a contract determined to be void ab initio, including the severability provisions, may be enforced."); *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians of Florida*, 63 F.3d 1030, 1047 & n.59 (11th Cir. 1995) (concluding that IGRA and NIGC regulations so dominate the field of tribal gaming that they are incorporated into gaming contracts as a matter of law).

## C.

We also have examined carefully Wells Fargo's submission that the district court should have allowed it leave to file an amended complaint to assert that the other documents in the case, most especially the bonds and the Bond Resolution of the Corporation, constitute independent waivers of the Corporation's sovereign immunity that are not dependent on the validity of the Indenture. In the view of Wells Fargo, even if it cannot assert a claim for breach of the Indenture, it can still seek other legal and equitable relief in connection with the bond transaction from Lake of the Torches on behalf of itself and the bondholder.

A plaintiff may amend a complaint after entry of a final judgment "only with leave of court after a motion under Rule 59(e) or 60(b) had been made and the judgment has been set aside or vacated." *Figgie Int'l, Inc. v. Miller*, 966 F.2d 1178, 1179 (7th Cir. 1992). In this case, however, the district court *sua sponte* dismissed the case for lack of subject matter jurisdiction with prejudice and entered final judgment before Lake of the Torches had filed a responsive pleading and without any notice to Wells Fargo that the court was contemplating such a course. As such, the district court should have granted relief from the judgment and permitted Wells Fargo leave to amend unless it found undue delay, bad faith or dilatory motive, or if amending the complaint would have been futile because the amended complaint would not survive dismissal. *See Chaudhry v. Nucor Steel-Indiana*, 546 F.3d 832, 838-39 (7th Cir. 2008); *Foster v. DeLuca*, 545

F.3d 582, 584-85 (7th Cir. 2008); *Frey v. Envtl. Prot. Agency*, 270 F.3d 1129, 1131-32 (7th Cir. 2001).

The district court concluded that any amendment would be futile and therefore refused to grant relief from the judgment. The district court rested its decision on essentially two grounds. Primarily, the court determined that the various transactional documents upon which Wells Fargo relied were simply collateral to the Indenture and that the bonds incorporated by reference the Indenture's terms. As such, the entire transaction, including all collateral agreements, required the Chairman's approval, and the bonds themselves were also management contracts subject to the Act's approval requirement. Without such approval, the collateral Bond Documents were, in the view of the district court, similarly void.

We do not believe that this analysis can support the district court's decision. As our colleagues in the Second Circuit have held, a document collateral to a management contract "is subject to agency approval . . . only if it 'provides for the management of all or part of a gaming operation.'" *Catskill Dev.*, 547 F.3d at 130 (quoting 25 C.F.R. § 502.15).[16] In our view, the mere reference to a related

---

[16] *See also Catskill Dev.*, 547 F.3d at 130 n.20 (rejecting an interpretation of IGRA regulations "as requiring NIGC approval of *all* collateral contracts" (emphasis in original)); *Jena Band of Choctaw Indians v. Tri-Millennium Corp.*, 387 F. Supp. 2d 671, 677-78 (W.D. La. 2005) ("[O]nly those collateral agreements that should also be considered management contracts because they

(continued...)

management contract does not render a collateral document subject to the Act's approval requirement.

The district court also believed that the waivers of sovereign immunity in the collateral documents are void because the documents are interdependent and support but one basic transaction, of which the Indenture was a crucial part. We believe that the district court's reliance on this ground was premature. It is not immediately apparent that the waivers contained in the documents attached to the proffered amended complaint, when read separately or together, ought to be construed as dependent on the validity of the waiver in the Indenture and that they do not make clear the Corporation's intent to render itself amenable to suit for legal and equitable claims in connection with the bond transaction, *see C & L Enters., Inc. v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 532 U.S. 411 (2001); *Sokaogon Gaming Enter. Corp. v. Tushie-Montgomery Assocs., Inc.*, 86 F.3d 656 (7th Cir. 1996). These issues are not susceptible to resolution on the face of the amended complaint, and Wells Fargo's opportunity to file a reply brief was not an adequate opportunity for the thorough litigation required to resolve them.

---

(...continued)

provide for the management of a gaming operation are void without NIGC approval."); Kevin K. Washburn, *The Mechanics of Indian Gaming Management Contract Approval*, 8 Gaming L. Rev. 333, 344-45 (2004) (explaining that the Commission "strictly has jurisdiction to review and approve only 'management contracts'" and that the Commission "does not intend that [unapproved collateral] agreements are void").

Another, and more fundamental, issue went unanswered by the district court in its consideration of the motion to file the amended complaint. Once the Indenture is voided, the standing of Wells Fargo to seek the return of the funds to the bondholder is not self-evident. Lake of the Torches contested Wells Fargo's standing in its briefing before the district court, and Wells Fargo responded that the failure of an express trust results in a constructive trust in favor of the beneficiary that preserves the trustee's standing to litigate on behalf of the beneficiary. However, the issue was not explored fully by either party, and it deserves more comprehensive consideration on remand.

In sum, on remand, the district court should grant Wells Fargo's motion for leave to file an amended complaint insofar as it states claims for legal and equitable relief in connection with the bond transaction. The court should then address whether Wells Fargo's standing to seek such relief on behalf of the bondholder survives the voiding of the Indenture. It should proceed to address whether the transactional documents, taken alone or together, evince an intent on the part of the Corporation to waive sovereign immunity with respect to claims by Wells Fargo on its own behalf and, if it has standing to do so, on behalf of the bondholder.

## Conclusion

We conclude that the Indenture constitutes a management contract under IGRA and that, as a condition of its validity, it should have been submitted to the Chairman

of the NIGC for approval prior to its implementation. The parties' failure to secure such approval renders the Indenture void in its entirety and thus invalidates the Corporation's waiver of sovereign immunity. The district court therefore correctly determined that it was without jurisdiction with respect to Wells Fargo's motion for the appointment of a receiver.

We further conclude that the district court should have permitted Wells Fargo leave to file an amended complaint to the extent that it presented claims for legal and equitable relief in connection with the bond transaction on its own behalf and on behalf of the bondholder. Upon the filing of such a complaint, the district court should address the issue of whether, now that the Indenture has been determined to be void, Wells Fargo has standing to litigate claims on behalf of the bondholder. The court also must determine whether the collateral documents, when read separately or together, waive the sovereign immunity of the Corporation with respect to any such claims. If such a waiver is found, the court may proceed to determine the merits of those claims.

Accordingly, the judgment of the district court is affirmed in part and reversed and remanded in part. The parties shall pay their own costs in this appeal.

AFFIRMED IN PART,
REVERSED and REMANDED IN PART

9-6-11