In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 14-2529

STATE OF WISCONSIN

*Plaintiff-Appellee,*

*v.*

HO-CHUNK NATION,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 13-cv-334 — **Barbara B. Crabb**, *Judge.*

_____

ARGUED DECEMBER 2, 2014 — DECIDED APRIL 29, 2015

_____

Before WOOD, *Chief Judge,* and WILLIAMS and TINDER, *Circuit Judges.*

WOOD, *Chief Judge.* The State of Wisconsin sued the Ho-Chunk Nation of Wisconsin to stop the tribe from offering electronic poker at its Madison gaming facility. The state maintained that the tribe was violating its agreement with the state to refrain from conducting Class III gaming at that location. The tribe responded that its poker is a Class II game

that is permitted by law. The state prevailed in the district court, and the Ho-Chunk Nation now appeals. We reverse.

**I**

The Ho-Chunk Nation (the Nation) is a federally recognized Indian tribe with land located in fourteen counties in Wisconsin. That land is held in trust for the tribe by the United States. Like a number of tribes, the Nation has pursued gaming as a catalyst for economic development. The Nation established its first bingo hall in 1983 following a judicial ruling that a 1973 amendment to the state constitution legalizing bingo games had the effect of ending the state's authority to restrict and regulate bingo on tribal reservations. By 1992, pursuant to Wis. Stat. § 14.035, the Governor of Wisconsin had entered into gaming compacts with all of the state's tribes, including the Nation. The Nation adopted a gaming ordinance, which it later amended four times, authorizing the tribe to "conduct all forms of Class I and Class II gaming on the Nation's lands."

The gaming classes to which these compacts and ordinances refer are defined in the Indian Gaming Regulatory Act (IGRA), at 25 U.S.C. § 2703(6), (7), and (8). Class I gaming includes social games and traditional Indian gaming; it is regulated exclusively by Indian tribes. 25 U.S.C. §§ 2703(6), 2710(a)(1). Class II gaming includes bingo and certain nonbanked card games that are "explicitly authorized by the laws of the State, or … are not explicitly prohibited by the laws of the State and are played at any location in the State." 25 U.S.C. §§ 2703(7)(A)(ii), 2710(b)(1). (Wisconsin's Legislative Reference Bureau defines nonbanked games as those "in which players compete against one another as opposed to playing against the house." See Wis. Legislative

Reference Bureau, *The Evolution of Legalized Gambling in Wisconsin*, Informational Bull. 12-2 at 24 (Nov. 2012) http://legis.wisconsin.gov/lrb/pubs/ib/12ib2.pdf.) Class III gaming is a residual category that covers "all forms of gaming that are not class I gaming or class II gaming." 25 U.S.C. § 2703(8). This case hinges on the fact that Class II gaming is enforced exclusively by the tribes and the National Indian Gaming Commission (Gaming Commission), 25 U.S.C. § 2710(b), whereas Class III gaming is regulated pursuant to tribal-state compacts, 25 U.S.C. § 2710(d).

The Nation operates several gaming facilities, including one in Madison, now called Ho-Chunk Gaming Madison. On April 25, 2003, the Nation and Wisconsin executed a document referred to as the Second Amendment to the Compact, which authorized the Nation to conduct Class III gaming at the Madison facility, provided Dane County authorized it to do so. But Dane County withheld its authorization after the voters rejected by a margin of nearly two to one a referendum to that effect held on February 17, 2004.

The current Compact, as amended on September 16, 2008, does not restrict the ability of the Nation to offer Class II gaming on its tribal lands, including the Madison facility (nor could it as a matter of federal law). Since November 2010, the Nation has offered nonbanked poker at Ho-Chunk Gaming Madison. (The parties' Joint Statement of Stipulated Facts explicitly recognizes that the type of poker offered at the Madison facility is nonbanked.[1]) Wisconsin considers

---

[1] Paragraphs 25 and 26 of the Joint Stipulation contain the most information about the type of poker involved here and the parties' agreement that it is nonbanked:

this nonbanked poker to be a Class III game. It accordingly sought an injunction in federal court to stop the poker, which if properly classified as Class III would violate the Nation's compact with the state. Both the state and the tribe filed motions for summary judgment based on the stipulated facts. The district court ruled that the electronic poker was, as the state had contended, a Class III game, and so it granted the state's motion for summary judgment and denied the tribe's motion. The court enjoined the Nation from offering poker at the Madison facility, but stayed the injunction pending the Nation's appeal to this Court.

---

"25. E-Poker does not use live dealers or paper or plastic cards and gaming chips. Instead, cards are shuffled and dealt in an electronic medium, with each player viewing his or her cards at their respective player stations located around the table. Gaming chips are also maintained in an electronic medium, and players can view their chip balance on their individual player stations, which contain touch screens for the players to view their cards, chips, and other game information. The players also use the touch screen to input game decisions (*e.g.*, to bet, to check, to fold, etc.). A large video screen in the center of the table displays wagers made by each player, the community cards dealt, and other game information, including the pot total for each hand. Player accounts are maintained at the cashier's cage or other secure location where players must conduct cash-in and cash-out functions.

26. E-Poker is not house banked. HCG Madison collects a "rake" from the player's wagers and places all bets in a common pool or pot from which all player winnings and the rake are paid. All player funds are tracked and accounted for by the e-Poker table system's automated accounting function."

**II**

We review a district court's grant of summary judgment *de novo*. *Prestwick Capital Mgmt. v. Peregrine Fin. Grp.*, 727 F.3d 646, 655 (7th Cir. 2013). We also review *de novo* any legal questions, including those involving statutory interpretation. *Tradesman Int'l, Inc. v. Black*, 724 F.3d 1004, 1009 (7th Cir. 2013). If the version of poker the Nation offers at its Madison facility is a Class II game under the statute, the Nation has the authority to offer the game without securing Wisconsin's permission. If it is a Class III game, the Nation may not offer it at the Madison facility under the current compact with Wisconsin.

To decide which is the proper classification, we begin with IGRA, 25 U.S.C. §§ 2701–2721. The Act's "stated goals were to create a comprehensive regulatory framework 'for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments,' to 'shield [tribes] from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players.'" *Wells Fargo Bank v. Lake of the Torches Econ. Dev. Corp.*, 658 F.3d 684, 687 (7th Cir. 2011) (quoting 25 U.S.C. § 2702(1)–(2)).

As we noted earlier, IGRA divides all Indian gaming (that is, gambling run by federally recognized tribes) into three classes, each subject to different levels of tribal, federal, and state regulation. As we have noted, we are concerned with Classes II and III. Class II gaming includes bingo, bingo-like games (such as pull tabs), and nonbanked card games allowed under state law. In a nonbanked game, play-

ers bet against one another, and the house has no monetary stake in the bets. In a banked game, such as blackjack, players bet against the house. Among Class II games, IGRA includes

> card games that—
>
> (I)      are explicitly authorized by the laws of the State, or
>
> (II)     are not explicitly prohibited by the laws of the State and are played at any location in the State,
>
> but only if such card games are played in conformity with those laws and regulations (if any) of the State regarding hours or periods of operation of such card games or limitations on wagers or pot sizes in such card games.
>
> 25 U.S.C. § 2703(7)(A)(ii).

Class II gaming is within the control of the tribes, but it is also subject to regulation by the Gaming Commission, which has the power to bring enforcement actions against tribes. The Commission must oversee a tribe's Class II gaming unless it has granted the tribe a certificate of self-regulation.

Class III gaming (the residual category) includes the types of games that most would associate with casinos: slot machines, craps, roulette, and banked card games like blackjack. It is permitted if three conditions are met: 1) the tribe has eligible trust lands in the state, 2) the state permits the gaming for any purpose, and 3) the gaming is governed by a state-tribe compact. Notably, the first two are identical to the requirements for Class II gaming. To meet the third requirement, a tribe must enter a compact with the state, and

the compact must take effect before the casino opens. *Id.* § 2710(d)(1). These compacts sometimes involve extensive negotiation and litigation. See, *e.g.*, *In Re Gaming Related Cases*, 331 F.3d 1094 (9th Cir. 2003). A state must "negotiate in good faith" with a tribe when it requests a compact, but a state cannot be forced through litigation to negotiate. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996). If the parties succeed in concluding a compact and the Secretary of the Interior approves it, she must publish notice of the approval in the Federal Register. 25 U.S.C. § 2710(d)(8)(D). The Secretary may disapprove a compact, if it violates IGRA, any other federal law, or the trust obligations of the United States to Indians. *Id.* § 2710(d)(8)(B). If the Secretary takes no action within 45 days of the date when the compact is submitted for approval, the compact is considered approved. *Id.* § 2710(d)(8)(C).

Wisconsin law does not explicitly authorize the Nation to offer nonbanked poker, and so the Nation cannot rely on section 2703(7)(A)(ii)(I). It can prevail, if at all, only under section 2703(7)(A)(ii)(II)—that is, if the games are not explicitly prohibited by the laws of the state and are played at any location in the state. One other provision of IGRA is relevant: section 2710(b)(1), which says that a tribe may engage in Class II gaming if the state "permits such gaming for any purpose by any person, organization or entity." *Id*. In other words, Class II gaming "is permitted only on tribal lands in states that do not entirely prohibit such gaming and only where the tribal resolution authorizing the operation is approved by the Chairman of the Commission." *Wells Fargo Bank*, 658 F.3d at 687 (citing 25 U.S.C. § 2710(b)(1)(A)–(B)).

The parties dispute how sections 2703(7)(A)(ii) and 2710(b)(1) should be understood. The debate arises out of the Supreme Court's decision in *California v. Cabazon Band of Mission Indians,* 480 U.S. 202 (1987), which drew a distinction between regulatory and prohibitory measures and held that only prohibitory measures can negate the permission required by section 2710(b)(1). In *Cabazon*, the Supreme Court held that California could not impose its gaming regulations on tribal gaming operations because the state's gaming laws were regulatory, not criminal. *Id.* at 220–22. This was important because California is one of the states covered by a statute commonly known as Public Law 280; that law takes away the federal government's authority under 18 U.S.C. §§ 1152–53 to prosecute Indian country crimes and turns that power over to the listed states. See Pub. L. No. 83-280, 67 Stat. 588 (1953). Had the gaming regulations been classified as criminal, California would have been entitled to impose its rules on the tribe's operations. *Cabazon* concluded that since Congress had not explicitly granted the state regulatory authority over gaming, the state's laws were preempted in light of the profound federal interests in tribal self-government. The Court's decision in *Cabazon* led to a flood of activity, and states and tribes clamored for Congress to bring some order to tribal gaming.

Wisconsin is also a state listed in Public Law 280. The immediate question before the district court was whether it was necessary to go through the analysis required by *Cabazon,* or if section 2710(b)(1) leaves no room whatsoever for questioning whether the Wisconsin regime is regulatory or prohibitory. The court decided that "*Cabazon* had nothing to do [with] § 2703 or the meaning of 'class II gaming.'" It concluded that the Nation's nonbanked poker game was "ex-

plicitly prohibited by the laws of the state" and therefore was a Class III game. 25 U.S.C. § 2703(7)(A)(ii)(II). There was no point in consulting the legislative history of IGRA or Supreme Court precedent on Indian gaming, the court thought, because it understood Wisconsin to have an explicit prohibition of nonbanked poker for purposes of IGRA.

Our own review of the statutory scheme convinces us that it was error to put the Supreme Court's *Cabazon* decision to one side. The reference in section 2703(7)(A)(ii)(II) to "card games that … are not explicitly prohibited by the laws of the State" must be read not just in light of the language itself, but also with attention to "the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997). Just as Montana did in its litigation with the Blackfeet Tribe thirty years ago, Wisconsin "fails to appreciate … that the standard principles of statutory construction do not have their usual force in cases involving Indian law." *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766 (1985). "The canons of construction applicable in Indian law are rooted in the unique trust relationship between the United States and the Indians." *Oneida Cnty. v. Oneida Indian Nation of N.Y.*, 470 U.S. 226, 247 (1985); see also *Michigan v. Bay Mills Indian Cmty.*, 134 S. Ct. 2024, 2032 (2014) ("Although Congress has plenary authority over tribes, courts will not lightly assume that Congress in fact intends to undermine Indian self-governance." (citations omitted)). The leading treatise in the field summarizes the canons that the Supreme Court follows in cases construing laws affecting Indians as follows:

> [T]reaties, agreements, statutes, and Executive Orders [must] be liberally construed in favor of

> Indians, and … all ambiguities resolved in
> their favor. In addition, treaties and agree-
> ments are to be construed as Indians would
> have understood them, and tribal property
> rights and sovereignty are preserved unless
> Congress's intent to the contrary is clear and
> unambiguous.

COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 2.02[1] (2012 ed.). See *Oneida Cnty.*, 470 U.S. at 247–48 ; see also *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 196 (1999); *Worcester v. Georgia,* 31 U.S. (6 Pet.) 515, 528 (1832) (McLean, J., concurring).

These canons have been widely accepted. This court has acknowledged the special approach to statutory construction that Indian law demands. See, *e.g., Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 351 (7th Cir. 1983) (reviewing canons and stating that "these canons mandate that we adopt a liberal interpretation in favor of the Indians"). Our sister circuits are in accord. See, *e.g., NLRB v. Pueblo of San Juan*, 276 F.3d 1186, 1191–92 (10th Cir. 2002); *Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024, 1030 (2d Cir. 1990) ("We deem this legislative history instructive with respect to the meaning of the identical language in section 2710(d)(1)(B), regarding class III gaming, which we must interpret."). *Cf. Rancheria v. Jewell,* 776 F.3d 706, 713 (9th Cir. 2015) (declining to apply the Indian law canon in light of competing deference required by *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc*., 467 U.S. 837 (1984), but reaffirming that the Indian canon "appli[es] when there is a choice between interpretations that would favor Indians on the one hand and state or private actors on the other").

Wisconsin offers a second argument for finding *Cabazon* inapplicable here: because that case predates IGRA, it asserts, the Court's reasoning does not illuminate the statute. We find this unpersuasive. It makes more sense to read the statutory language knowing that Congress was legislating against the background of the Supreme Court's decisions. See, *e.g., Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 108 (1991). Nothing in the text of IGRA supports an inference that Congress was disapproving or limiting *Cabazon.* That is reason enough to reject the state's position.

The history of the legislation provides further support for the use of *Cabazon.* Other courts have found that the legislative history leaves no doubt that Congress intended the "permit" language for both Class II and Class III gaming in 25 U.S.C. § 2710 to incorporate the *Cabazon* regulatory/prohibitory distinction. See, *e.g., Mashantucket Pequot Tribe*, 913 F.2d at 1029 ("[T]he Senate Report specifically adopted the *Cabazon* rationale as interpretive of the requirement in section 2710(b)(1)(A) that class II gaming be 'located within a State that permits such gaming for any purpose by any person, organization or entity.'"); *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin*, 770 F. Supp. 480, 485 (W.D. Wis. 1991) ("The Senate committee stated that it anticipated that the federal courts would rely on the *Cabazon* distinction between regulatory gaming schemes and prohibitory laws."). A leading scholar in the field has also urged that this is the best reading of the statute. See WILLIAM C. CANBY, JR., AMERICAN INDIAN LAW IN A NUTSHELL 338 (2009) ("This restriction [of § 2710(b)(1)] is reflective of the rationale in *Cabazon Band*; if a state permits bingo or unbanked card games for any purpose, its public policy cannot be offended by this type of gambling."). We decline Wiscon-

sin's invitation to break new ground here. *Cabazon*'s regulatory/prohibitory distinction applies when determining whether state law permits (or does not prohibit) gambling for the purposes of IGRA.

We turn now to our inquiry under *Cabazon*: does Wisconsin "permit[] such gaming for any purpose by any person, organization or entity." 25 U.S.C. § 2710(b)(1)(a); see also *Cabazon*, 480 U.S. at 211 n. 10 ("The applicable state laws governing an activity must be examined in detail before they can be characterized as regulatory or prohibitory."); CONF. OF W. ATT'YS GEN., AMERICAN INDIAN LAW DESKBOOK § 12.16 (2014 ed.) ("The status of nonbanking card games as class II must be determined by reference to state law … where state law is silent as to the validity of nonbanking card games, they will be valid even if played only on Indian lands."). Just as they took different positions on the applicability of *Cabazon*, the parties dispute the proper sources of state law to consult when determining whether Wisconsin "permits" poker within the meaning of section 2710(b)(1)(a). We think it best to begin with Wisconsin's Constitution, and then consult its statutes and compacts with the tribes. After that, we discuss the Nation's suggestion that we should place some weight on the state's allegedly lax enforcement of video-poker laws and its poker advertising.

The parties disagree about the level of generality we ought to adopt as we examine whether Wisconsin prohibits poker. A general approach, which takes into account Wisconsin's approval of pari-mutuel horse and dog betting, strengthens the Nation's argument that Wisconsin has departed from its nineteenth-century constitutional prohibition on gambling and permits gambling conducted in compliance

with regulations. The Eighth and Ninth Circuits have held that for Class II gaming under IGRA, "the state cannot regulate and prohibit, alternately, game by game and device by device, turning its public policy off and on by minute degrees." *Sycuan Band of Mission Indians v. Roache*, 54 F.3d 535, 539 (9th Cir. 1994); see also *United States v. Sisseton-Wahpeton Sioux Tribe*, 897 F.2d 358, 368 (8th Cir. 1990). The Second Circuit has taken the same approach in an analysis of Class III gaming. See, *e.g.*, *Mashantucket Pequot Tribe* 913 F.2d at 1031–32 ("So here, the district court concluded, after a careful review of pertinent Connecticut law regarding 'Las Vegas nights,' that Connecticut 'permits' games of chance, albeit in a highly regulated form. Thus, such gaming is not totally repugnant to the State's public policy. Connecticut permits other forms of gambling, such as a state-operated lottery, bingo, jai alai and other forms of pari-mutuel betting.").

Some question has been raised about the relevance of decisions involving Class III gaming to our analysis here. Given the fact that Class III is defined as "not" Class I or II, we have no reason to refuse to look at the Class III decisions. Class III gaming incorporates the same state-law analysis used for Class II. Compare 25 U.S.C. § 2710(b)(1)(a) with § 2710(d)(1)(B). Moreover, Class II gaming is less regulated than Class III gaming. If Wisconsin is a regulatory state for purposes of Class III gaming, it would be anomalous to conclude that it somehow becomes prohibitory for purposes of Class II games. What we held a decade ago still applies: "Wisconsin has not been willing to sacrifice its lucrative lottery and to criminalize all gambling in order to obtain authority under *Cabazon* and § 2710(d)(1)(b) to prohibit gambling on Indian lands." *Lac Courte Oreilles Band of Lake Supe-*

*rior Chippewa Indians of Wis. v. United States*, 367 F.3d 650, 665 (7th Cir. 2004).

Even if we were to adopt a more exacting level of generality, our result would be the same. That would involve an analysis of Wisconsin law specifically for poker, not for gambling in general. The question would then be whether poker is "explicitly authorized by the laws of the State" or "not explicitly prohibited by the laws of the State and . . . played at any location in the State." 25 U.S.C. § 2703(7)(A)(ii). As we noted earlier, the Nation cannot point to any law that suggests Wisconsin explicitly authorizes the game, and so it must establish the latter.

Wisconsin's original 1848 constitution prohibited "any lottery." This provision had been interpreted as prohibiting all gambling. But the state abandoned that absolute position starting in the 1960s, when it legalized various forms of gaming (including promotional contests in 1965, charitable bingo in 1973, raffles in 1977, on-track pari-mutuel betting on horseracing in 1987, and a state lottery in 1987) through constitutional amendments. See Wis. Legislative Reference Bureau, *Decriminalization of Video Gambling*, Budget Br. 99-6 (Nov. 1999); see also *Oneida Tribe of Indians of Wisconsin v. Wisconsin*, 518 F. Supp. 712, 719 (W.D. Wis. 1981) (citing the 1973 constitutional amendment as evidence that "Wisconsin's bingo laws are civil-regulatory and … not enforceable by the state in Indian country"). When the Wisconsin Legislature's non-partisan research service described the state's approach to gambling two years ago, it had this to say: "The story of gambling in Wisconsin is an evolution from absolute legal prohibition to the present situation in which the state and certain organizations and entities, including Indian

tribes, may conduct a wide variety of gaming activities." Wis. Legislative Reference Bureau, *The Evolution of Legalized Gambling in Wisconsin*, Informational Bull. 12-2 at 1 (Nov. 2012) http://legis.wisconsin.gov/lrb/pubs/ib/12ib2.pdf.

We acknowledged these developments in an earlier IGRA dispute between a different tribe and Wisconsin: "The establishment of a state lottery signals Wisconsin's broader public policy of tolerating gaming on Indian lands …. [B]ecause IGRA permits gaming on Indian lands only if they are 'located in a State that permits such gaming for any purpose by any person, organization or entity,' the lottery's continued existence demonstrates Wisconsin's amenability to Indian gaming." *Lac Courte Oreilles Band*, 367 F.3d at 664 (citing *Cabazon* and quoting 25 U.S.C. § 2710(d)(1)(b)).

That does not mean that Wisconsin has become a free-for-all with respect to gambling. It amended its constitution in 1993 to restrict the types of gambling that could be authorized by the legislature. The state correctly points out that the 1993 constitutional amendment explicitly prohibited "poker." It hopes, by relying on that amendment, to avoid the otherwise clear implication of the constitutional and statutory changes from the previous three decades. The 1993 amendment reads, in relevant part, "Except as provided in this section, the legislature may not authorize gambling in any form." Wis. Const. art. IV, § 24(1). The article goes on to "provide otherwise" in several respects: it permits certain bingo games licensed by the state (§ 24(3)); it permits specified raffle games (§ 24(4)); it forbids the legislature from prohibiting pari-mutuel on-track betting (§ 24(5)); and it permits a lottery (§ 24(6)), although it then excludes from the

definition of the state-operated lottery several casino-style games, including poker. *Id.* art. IV, § 24(6)(c).

But Wisconsin cannot overcome two snags in the argument based on the 1993 constitutional amendment. First, the state itself does not treat the prohibition against poker as an insurmountable obstacle to Indian gaming. If poker were flatly prohibited as a matter of state constitutional and criminal law, a municipal referendum could not undo that constitutional prohibition. Yet that is what the state proposed to do in 2004, when the state and the Nation amended their compact to allow Class III gaming at the Madison facility if the voters of Dane County approved the arrangement in a referendum. The logical inference is that if the voters had said yes, then the Nation could have added poker to the games offered in the Madison casino. IGRA was designed to avoid precisely that kind of patchwork prohibition, in which the state banishes gaming in one county or situation and allows it in another. Wisconsin might argue that poker is not prohibited as a matter of state law in a Class III game, but there is no language in the state constitution that supports that position. As we discussed earlier, Class II and Class III games are subject to identical "permit" language in IGRA. Nor can Wisconsin explain, in light of its reading of IGRA, why the Governor himself was not flouting the state's criminal law when he contracted with the Nation to have them provide poker on other tribal lands.

The second problem with Wisconsin's position arises out of legislative action in 1999. Act 9, the budget passed by the Legislature that year, decriminalized (though did not fully legalize) the possession of five or fewer video gambling machines, including video poker, provided that the establish-

ment was licensed to serve alcohol. See Wis. Stat. §§ 945.03(2m) and 945.04(2m); see also Wis. Legislative Reference Bureau, *Decriminalization of Video Gambling*, Budget Br. 99-6 (Nov. 1999). Describing Act 9, the Legislative Reference Bureau noted that "[t]he new law decriminalized possession of five or fewer video gambling machines … reducing the penalty to a civil offense, subject to a forfeiture of up to $500 per machine. It also removed the threat that a tavern could have its alcohol beverage license revoked solely because of the machines." Wis. Legislative Reference Bureau, *The Evolution of Legalized Gambling in Wisconsin*, Research Bull. 00-1 (May 2000). Wisconsin rightly points out that Act 9 retained the criminal penalties for a patron to gamble using a video machine, but the Ho-Chunk Nation is in the position of the tavern proprietor, not the tavern patron.

Wisconsin cannot have it both ways. The state must entirely prohibit poker within its borders if it wants to prevent the Nation or any other Indian tribe from offering poker on the tribe's sovereign lands. See *Lake of the Torches* 658 F.3d at 687. When the state decriminalized hosting poker for taverns, it could no longer deny that game to tribes as a matter of federal law.

Wisconsin argues that the Wisconsin Supreme Court's decision in *Dairyland Greyhound Park v. Doyle*, 719 N.W.2d 408, 428 (Wis. 2006), reinforces its position that the state prohibits poker, but that case simply stands for the proposition that "based on the 1993 Amendment's history and the earliest legislative interpretations of that Amendment, we conclude that the 1993 Amendment was not intended to preclude the Tribes from conducting Class III games pursuant to the Original Compacts." *Id.* at 428. In other words, *Dairy-*

*land* confirms that the 1993 amendment to the state constitution did not affect the legality of Wisconsin's gaming compacts with the tribes. Justice Prosser's separate opinion, which both parties cite extensively, is of no help, because a majority of his colleagues explicitly rejected his reasoning. *Id.* at 441 ("Justice Prosser's arguments regarding the scope of gaming are structurally unsound.").

Finally, in the interest of completeness we add a few words about the remaining arguments the parties have advanced. We reject the Nation's suggestion that we should place some weight on the extent to which Wisconsin enforces its criminal law (or does not do so). The fact that the state delegates to its Department of Revenue the task of enforcing some criminal laws tells us exactly nothing. We have no intention of getting into the business of scrutinizing the vigor of enforcement for every gambling infraction in every case. Nothing in IGRA suggests the Class II or Class III gaming analysis demands anything beyond positive law. Nor do we rely on the fact that Wisconsin advertises poker on its tourism websites. To be sure, it would be odd for a state's tourism bureau to advertise an industry it regards as criminal or as against public policy. Nonetheless, it is quite unlikely that the people drafting advertising messages can dictate law enforcement policy to the state. This is best left out of the calculus.

Only one thing remains. In a letter dated February 26, 2009, the Gaming Commission concluded that the poker the Nation offers in Madison is Class II gaming because Wisconsin does not "wholly prohibit[]" poker. When a federal court interprets a statute, it should consider the interpretation of the expert agency charged with implementing that statute.

IGRA is the organic statute for the Gaming Commission. The Commission has expertise in classifying Indian gaming, and it issues regulations that further clarify what constitutes Class II gaming. 25 C.F.R. § 502.3(c); see also COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 12.02[3][a] ("The NIGC plays a very important role in the determination of whether proposed gaming is class II or class III … [and] is frequently called upon to determine whether a particular form of gaming falls within class II or class III.").

Wisconsin suggests that this letter has only persuasive value. It notes that the D.C. Circuit held that the Gaming Commission lacked authority to mandate operating procedures for Class III gaming. *Colo. River Indian Tribes v. NIGC*, 466 F.3d 134 (D.C. Cir. 2006). An agency that lacks the power to promulgate regulations for an area of economic activity might not enjoy much deference on classifying that activity. But see *Diamond Game Enter. v. Reno*, 230 F.3d 365, 369 (D.C. Cir. 2000) (discussing that court's frustration with the Gaming Commission's unwillingness to weigh in on a gaming classification issue and complaining "we have no choice but to proceed without the benefit of a Commission position, a situation we expect Congress neither anticipated nor would appreciate."). We will assume for the sake of argument that the letter of the Gaming Commission is too informal to trigger *Chevron* deference. The possibility of deference under *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), remains, however. In light of the system IGRA establishes and the evidence that Wisconsin does not prohibit poker as a matter of criminal law, the Gaming Commission's opinion is one item on the scale in favor of the Nation.

### III

IGRA creates a regulatory scheme that respects tribal sovereignty while carving out a regulatory role for the states on only the most lucrative forms of casino gambling and hence the forms of gambling most susceptible to organized crime. States may choose to bypass this regulatory scheme if they are willing to ban gaming across the board. But the states lack statutory authority to deny an Indian tribe the ability to offer gaming that is roughly equivalent to what the state allows for its residents. A state must criminalize a gambling activity in order to prohibit the tribe from engaging in it. Wisconsin does not criminalize nonbanked poker; it decriminalized that type of gaming in 1999. IGRA thus does not permit it to interfere with Class II poker on tribal land. This means that the Ho-Chunk Nation has the right to continue to offer nonbanked poker at its Madison facility.

The district court's judgment is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.