Filed 7/11/16  Wells Fargo Bank v. Cabzon Band of Mission Indians CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

WELLS FARGO BANK, N.A., as
Trustee, etc.,

     Plaintiff and Appellant,

v.

CABAZON BAND OF MISSION
INDIANS,

     Defendant and Appellant;

EAST VALLEY TOURIST
DEVELOPMENT AUTHORITY,

     Defendant and Respondent.

GOLDENTREE 2004 TRUST, et al.,

     Interveners and Respondents.

E060447

(Super.Ct.No. INC1205391)

ORDER MODIFYING OPINION

AND DENYING PETITION FOR
REHEARING

[NO CHANGE IN JUDGMENT]

1

The petition for rehearing is denied.  The opinion filed in this matter on June 15, 2016, is hereby modified, as follows:

Delete the first sentence of the last paragraph of section 1 on page 29, which reads:

> The Bank is the drafter of the indenture documents, requiring us to interpret them most strongly against the Bank, the party who caused any alleged uncertainty.

The last paragraph of section 1 on page 29 now reads:

> The Bank failed to show that the term "payable" referred to revenues that have not yet been deposited into the custodial account of the Tribe.

Except for this modification, the opinion remains unchanged.  This modification does not change the judgment.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS


RAMIREZ _____
                                                              P.J.

We concur:

McKINSTER _____
                              J.

MILLER _____
                              J.


2

Filed 6/15/16  Wells Fargo Bank v. Cabazon Band of Mission Indians CA4/2 (unmodified version)

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| WELLS FARGO BANK, N.A., as Trustee, etc., | E060447 |
| Plaintiff and Appellant, | (Super.Ct.No. INC1205391) |
| v. | OPINION |
| CABAZON BAND OF MISSION INDIANS, | |
| Defendant and Appellant; | |
| EAST VALLEY TOURIST DEVELOPMENT AUTHORITY, | |
| Defendant and Respondent. | |
| GOLDENTREE 2004 TRUST, et al., | |
| Interveners and Respondents. | |

APPEAL from the Superior Court of Riverside County.  John G. Evans, Judge.

Affirmed.

1

Brown George Ross, Eric M. George, Ira G. Bibbero, and Lori Sambol Brody for Plaintiff and Appellant.

Drinker Biddle & Reath, Paul M. Gelb and Sheldon E. Eisenberg for Defendant and Appellant.

Latham & Watkins, Wayne S. Flick, Amy C. Quartarolo and Nima H. Mohebbi for Interveners and Respondents.

In 2006, plaintiff Wells Fargo Bank (plaintiff or Bank) loaned $56,570,000 to the Cabazon Band of Mission Indians (Tribe) to build a new parking garage for a casino, which was operated by East Valley Tourist Development Authority (EVTDA), an instrumentality of the Tribe. The loan agreement included a provision that payments would be made to the Bank from a custodial bank account, into which EVTDA deposited the Tribe's net income from the casino, resort and golf course, which were operated by EVTDA. In August 2007, EVTDA was indebted under a bridge loan from Merrill Lynch and others in the amount of more than $180 million relating to the improvement and operation of the casino, resort and golf course on tribal land. The bridge loan included terms limiting amounts payable to the Tribe.

Due to the recession of 2008, revenues from the casino and resort declined, so the Tribe and EVTDA restructured their loans, with the Tribe executing a supplemental trust indenture in favor of Bank, and EVTDA executed an amended bridge loan agreement with its lenders. In April 2012, the Tribe and EVTDA informed their respective lenders

2

that they could not continue payments and wished to restructure the loans. EVTDA's lenders agreed to restructure its loans, but Bank notified the Tribe it was in default.

The Bank filed a lawsuit for breach of contract and for injunctive relief to compel EVTDA to deposit funds into the custodial account. Cross motions for summary adjudication were filed by the Bank and the Tribe. The lower court granted Bank's motion for summary adjudication as to the breach of contract action, and granted the Tribe's motion for summary adjudication as to the cause of action for injunctive relief. Both parties appealed.

On appeal, the Tribe argues that the trial court erred in granting summary adjudication on the breach of contract cause of action on the ground it violates the Indian Gaming Act and erred in its calculation of damages. On cross-appeal, the Bank argues the court erred in denying injunctive relief and attorneys fees. We affirm.

## BACKGROUND

From the pleadings, we discern the following facts:

The Tribe, through its instrumentality EVTDA, owns and operates Fantasy Springs Resort and Casino. EVTDA is a separate entity, established pursuant to a Tribal Ordinance. Revenues from the resort and casino cover operational costs and improvements to the resort and casino, and the balance is distributed to the Tribe for maintenance of the Tribal government and to Tribe members. The revenue from the casino and resort comprise the Tribe's primary source of revenue for operating its

3

government and providing services for tribal members and their families, including medical/dental insurance, child care, education, housing, and retirement benefits, as well as maintenance and repair of the reservation's infrastructure.

On June 1, 2006, the Tribe borrowed $56,570,000 from Bank for the purpose of constructing a parking garage, executing a senior note and an original indenture agreement with the Bank. The Bank is trustee under the indenture agreement. Section 6.3 of the original indenture agreement[1] allows the Bank to declare the principal of all notes, together with an acceleration premium, and accrued interest thereon, to be immediately due in the event of default. The indenture also requires the Tribe to maintain a "custodial account" at the Bank into which the Tribe was required to deposit all of the Distributable Authority Revenues (DAR), promptly after receipt.

Payment of the loan was secured by a pledge agreement and assignment by the Tribe of the DAR, which were to be deposited by the Tribe or EVTDA into a custodial account. "Distributable Authority Revenues" is defined by the indenture to mean "all of the gross revenues, receipts and income of the East Valley Authority deposited with the Resort Development Bond Trustee in accordance with the Resort Development Bond Indenture and available thereunder for general distribution to the East Valley Authority

---

[1] This provision was unaffected by the subsequent amendment to the indenture.

4

[*sic*] or the Tribe and not otherwise pledged, assigned, transferred or encumbered for the purpose of satisfying any obligation of the East Valley Authority."

A Uniform Commercial Code (UCC) financing statement was filed in connection with the transaction. The collateral description attached as an exhibit to the UCC filing restated the definition of DAR as the collateral for the debt, but added that the "Distributable Authority Revenues include all revenues transferred to and deposited in, or available to be transferred to and deposited in, the Custodial Account (as defined below)." The definition of "Custodial Account" as included in the Collateral Description means "the Distributable Authority Revenues deposited on a monthly basis with Wells Fargo, as custodian, for deposit for the benefit of the Tribe."

The Tribe sold the senior note to GMS Group as underwriter, and GMS Group sold the note to Fantasy Springs Acquisition (Fantasy Springs), a special purpose vehicle formed by Saybrook Capital to hold the note. Saybrook's Tax Exempt Opportunity Fund III[2] owns 100 percent of Fantasy Springs, the noteholder. The agreement was secured by a perfected interest in DAR, which comprised monthly distributions from EVTDA to the Tribe. The indenture provided for a tribal custodial account, into which the Tribe would

---

[2] Collectively, these entities are referred to as "Saybrook."

deposit all the DARs promptly after receipt from EVTDA, for so long as the Senior Notes were outstanding.[3] In 2007, the Tribe redeemed $10 million of the original note.

In August 2007, EVTDA and the Tribe obtained a bridge loan in the amount of $153 million through Merrill Lynch to consummate refinancing, pay transaction costs, and for working capital respecting the expansion, construction and improvement projects relating to the resort and casino. The bridge loan provided for the establishment of a certain deposit account, which was subject to a control agreement. Under the control agreement, in the event of a default, the deposit account would come under the control of an administrative agent of Merrill Lynch.

Section 6.08 of the bridge loan also limited payments by EVTDA to the Tribe, but it permitted a distribution to the Tribe that included $13,904,667.00 to be used to pay a portion of the Saybrook note. The parties did not dispute that this provision of the loan agreement provided that EVTDA could not make any payment or distribution to the Tribe or any general distribution to Tribe members in the event of a default on the bridge loan. The bridge loan was secured by a first lien on all revenues, including deposit accounts and assets of the EVTDA.

_____

[3] However, EVTDA is not an obligor under the Saybrook notes, so the noteholders have no recourse against the revenue of EVTDA.

In August 2009, EVTDA acknowledged that certain events of default, as defined in the bridge loan agreement, had occurred.  This led to a waiver and first amendment to the bridge loan agreement.  The amendment permitted distributions to the Tribe respecting the Saybrook notes under the Tribe's indenture agreement, and mortgage notes.  The amount distributable under the Saybrook notes was $2,565,768.00.

In May 2010, the Tribe and EVTDA restructured their loans.  On May 1, 2010, the Tribe executed an amended and restated note in the principal amount of $41,070,000, along with a first supplemental trust indenture, and an amended and restated pledge and transfer agreement.  The supplemental indenture added the Tribe's agreement to pay "payment in kind" (PIK) interest in addition to the interest on the loan, interest on the PIK interest, and acknowledged the bridge loan agreement of 2007, the first amendment to the bridge loan, as well as the second amendment to the bridge loan, executed on the same date in 2010 as the supplemental indenture.[4]

---

[4] The agreement to pay additional PIK interest provides that "[t]he Accrued PIK Interest and Interest on PIK Interest shall be deemed for all purposes hereunder and under the Notes to be additional accrued and unpaid interest on the Notes payable with respect to each Note upon final maturity, upon any optional redemption thereof prior to maturity, and on the last day of the Extended Waiver Period."  "Extended Waiver Period" was defined in the indenture as the period from and after December 1, 2008 and continuing through, and including, the earliest to occur of either August 6, 2012 or various other contingencies.

EVTDA's second amendment to the bridge loan included permission for EVTDA to distribute funds to the Tribe for purposes of paying down the Saybrook notes. The amendments also permitted EVTDA to make limited payments to the Tribe to support its governmental services. Saybrook and Fantasy Springs consented in writing to the Tribe's supplemental trust indenture, amended/restated pledge and transfer agreement, as well as EVTDA's bridge loan.[5] GTAM Asset Management, LP (GTAM) holds a controlling interest in the bridge loan held by EVTDA. GTAM, as the controlling interest-holder in the bridge loan, has the right to consent to or to withhold consent to distributions by EVTDA to the Tribe. As a result of the restructuring, the balance due on the Saybrook notes was reduced to $41,070,000.[6]

Up until 2012, the Tribe complied with its obligations under the note. However, after the economic downturn between June 2006 and the fall of 2008, cash flow to the Tribe from gaming operations declined from $46.4 million in fiscal year 2007 to $31.1 million for fiscal year 2011. From May 2010 to March 2012, the Tribe paid monthly

---

[5] The record includes an unexecuted version of Saybrook's acknowledgment and consent of note owner, but Saybrook representatives admitted signing the consent during discovery.

[6] In agreeing to the bridge loan transaction, Saybrook insisted on repayment of $10 million of the senior notes at a 30 percent premium, so it received $13 million for $10 million of debt. In return, Saybrook's acknowledgment of the bridge loans permitted payments to the tribe for essential governmental services.

payments of $320,721 to partially service payment of interest on the senior notes, with any shortfall continuing to accrue as PIK interest.

Up until March 23, 2012, EVTDA made monthly distributions to the Tribe of approximately $1.12 million. On March 23, 2012, the EVTDA Board of Directors passed a resolution regarding its outstanding debt obligations because the term loan (bridge loan) was scheduled to mature on May 1, 2012. The resolution recommended that EVTDA and the Tribe engage their respective lenders in negotiations to restructure their debts in order to create a sustainable capital structure. On March 29, 2012, the Tribe passed a similar resolution.

On April 2, 2012, the Tribe and EVTDA sent a notice to their creditors that they intended to restructure their debt and would cease making debt service payments pending that restructuring. The joint letter indicated the debtors sought the involvement of all lenders in negotiating and restructuring the loans in order to create a sustainable capital structure for the business that would fairly address the claims of all affected lenders. The bridge lenders engaged in negotiations with the Tribe and EVTDA to resolve the claims as requested in the notification. On April 3, 2012, EVTDA's lenders, through their legal counsel, issued a reservation of rights letter. But on July 17, 2012, the Bank notified the Tribe that an event of default had occurred.

Since April 1, 2012, neither the Tribe nor EVTDA has deposited DARs into the custodial account. In the meantime, EVTDA has continued to operate the resort, but due

9

to its default of the bridge loan, the lender's administrative agent took control of its deposit account, pursuant to the control agreement executed in connection with the bridge loan. Thus, aside from monthly payments to the Tribe of $668,000 permitted by the bridge loan for essential Tribal governmental operations, EVTDA has not deposited DAR payments to the Tribe's custodial account.

GTAM and the other bridge lenders approved the limited monthly payments to the Tribe because only the Tribe can operate the gaming operations of the resort, and the lack of any funds would impair the Tribe's and EVTDA's ability to generate funds to make payments on the bridge loan and any junior debts, and to allow the Tribe to continue providing its essential governmental services. GTAM has the authority and power to withhold consent for further distributions from EVTDA to the Tribe. On July 17, 2012, the Bank, as trustee, sent notice of default to the Tribe, accelerating all amounts outstanding under the loan.

On July 31, 2012, the Bank filed a complaint for damages for breach of contract, injunctive relief, and declaratory relief against the Tribe and EVTDA.[7] The claim for injunctive relief sought an order prohibiting the Tribe from using revenue distributed by EVTDA, to enjoin EVTDA from transferring any DAR to the Tribe, for an accounting of

---

[7] EVTDA was named only in the causes of action pertaining to injunctive or declaratory relief, and was not named in the breach of contract cause of action.

10

DARs paid by EVTDA, and an order compelling EVTDA to deposit DARs into the Tribe's custodial account with the Bank.

On April 3, 2013, the trial court granted GTAM's motion for leave to file its complaint[8] in intervention to resist Bank's second cause of action for injunctive relief. GTAM filed a complaint in intervention on April 5, 2013.

On April 19, 2013, the Bank and the Tribe filed cross motions for summary adjudication. The Bank sought summary adjudication as to its first cause of action for damages for breach of contract against the Tribe, while the Tribe and EVTDA sought summary adjudication in its favor as to the second cause of action for injunctive relief. On June 28, 2013, GTAM filed a motion for summary adjudication as to the second cause of action for injunctive relief.

On October 23, 2013, after having taken the matter under submission, the trial court issued its minute order granting the Bank's motion for summary adjudication as to

---

[8] GTAM has requested that we take judicial notice of (1) its complaint for breach of contract, filed against the Tribe on March 13, 2014; (2) the Bank's motion to intervene in that action; and (3) notice of the October 9, 2014 order of the superior court staying GTAM's action pending resolution of the instant case between the Bank and the Tribe. In response, the Bank requests judicial notice of GTAM's request of dismissal of the action filed in March 2013, in the event we grant GTAM's request. While these documents, as court records, are proper subjects of judicial notice (Evid. Code, § 452, subd. (d)), they pertain to matters filed after the trial court ruled on the summary judgment motion that is the subject of this appeal, so they were not before the court when it made the ruling that is the subject of this appeal. We deny both requests.

11

the first cause of action for breach of contract against the Tribe, and granting the Tribe's and EVTDA's motion for summary adjudication as to the second cause of action for injunctive relief. Judgment on the first cause of action was entered in favor of the Bank in the amount of $65,251,439.23, and judgment on the second cause of action was entered in favor of the Tribe and EVTDA.[9] The Tribe appealed the ruling in favor of the Bank on the first cause of action, and the Bank cross-appealed the ruling denying relief on the second cause of action. The trial court subsequently awarded attorneys fees to EVTDA, after denying Banks motion for same. By stipulation, EVTDA's cost memo was allowed for costs totaling $32,271.90 as against the Bank, and the Bank's cost memo was allowed for costs in the amount of $77,975.58 against the Tribe only.

## DISCUSSION

1.      *General Principles Relating to Summary Adjudication Motions.*

A party may move for summary adjudication as to one or more causes of action within an action, affirmative defenses, claims for damages, if that party contends that the cause of action has no merit or that there is no affirmative defense thereto, or that there is no merit to an affirmative defense as to any cause of action, or that there is no merit to a claim for damages. (Code Civ. Proc., § 437c, subd. (f)(1).) A motion for summary adjudication is properly granted when the evidence in support of the moving party

---

[9] The Bank voluntarily dismissed the third cause of action on December 13, 2013.

12

establishes that there is no issue of material fact to be tried as to a particular cause of action, affirmative defense, claim for damages or issue of duty.  (*Ibid*.; *Marron v. Superior Court* (2003) 108 Cal.App.4th 1049, 1056-1057.)

Once a plaintiff, as the party moving for summary adjudication, has met his or her burden of showing that there is no defense to a cause of action, the burden shifts to the defendant or cross-defendant to show that a triable issue of one or more material facts exists as to that cause of action or a defense thereto.  (Code Civ. Proc., § 437c, subd. (p)(1); *Acosta v. Glenfed Development Corp.* (2005) 128 Cal.App.4th 1278, 1292.)  The defendant or cross-defendant shall not rely upon the mere allegations or denials of its pleadings to show that a triable issue of material fact exists, but, instead, shall set forth the specific facts showing that a triable issue of material fact exists as to that cause of action or defense thereto.  (Code Civ. Proc., § 437c, subd. (p)(1).)

Similar rules apply when the defendant, as moving party, has met his or her burden of showing that a cause of action has no merit.  (Code Civ. Proc., § 437c, subd. (p)(2).)  The burden then shifts to the plaintiff to show that a triable issue of material fact exists as to that cause of action.  (Code Civ. Proc., § 437, subd. (p)(2).)  The plaintiff shall not rely upon the mere allegations of its pleadings to show that a triable issue of material fact exists.  (Code Civ. Proc.,§ 437c, subd. (p)(2).)

If the trial court concludes there is no triable issue of material fact and the sole remaining issue is one of law, the trial court has a duty to determine the issue of law.

13

(*Marron v. Superior Court, supra,* 108 Cal.App.4th at p. 1057.)  The purpose of the law of summary judgment and summary adjudication is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute.  (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843; *Smith v. Wells Fargo Bank* (2005) 135 Cal.App.4th 1463, 1472.)

The standards applicable to summary judgment motions (and summary adjudication motions) under Code of Civil Procedure section 437c provide that the motion be granted if the papers show there is no triable issue of material fact and the moving party is entitled to a judgment as a matter of law.  (*Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at p. 843.)  Code of Civil Procedure section 437c, subdivision (o) provides that a cause of action has no merit if:  "(1) One or more of the elements of the cause of action cannot be separately established even if that element is separately pleaded [; or]  [¶]  (2) a defendant establishes an affirmative defense to that cause of action."  Section 437c, subdivision (p)(1) provides that a plaintiff or cross-complainant has met his or her burden of showing that there is no defense to a cause of action if that party has proved each element of the cause of action entitling the party to judgment on that cause of action.

On appeal, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and

14

sustained.  (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334; see also, *Smith v. Wells Fargo Bank, supra,* 135 Cal.App.4th at p. 1471.)  We examine the facts presented to the trial court and determine their effect as a matter of law.  (*Hartline v. Kaiser Foundation Hospitals* (2005) 132 Cal.App.4th 458, 465.)  Additionally, we construe the opponent's affidavits liberally, and resolve doubts about the propriety of granting the motion in favor of the party opposing it.  (*Hartford Casualty Ins. Co. v. Swift Distribution* (2014) 59 Cal.4th 277, 286.)

2. *The Tribe's Appeal:  The Trial Court Properly Granted Summary Adjudication to the Bank on the Breach of Contract Cause of Action.*

The lower court found that the Tribe failed to establish (a) an affirmative defense relating to a violation of the sole proprietary interest rule under the Indian Gaming Regulatory Act; (b) illegality of the acceleration premium under the indenture agreement; and (c) that its obligation to pay PIK interest ended with the termination of the extended waiver period.  On appeal, the Tribe challenges each of these conclusions in urging us to reverse the order granting summary adjudication on the breach of contract claim.  We disagree.

A. *The Inclusion of the Acceleration Premium in the Damage Award Was Authorized by Contract.*

The Tribe argues the trial court made a $4.5 million error in the award of damages to the Bank in granting summary adjudication on the breach of contract claim, by

15

including the amounts claimed as an acceleration premium under the indenture. The Tribe argues that the acceleration premium constituted an impermissible and unenforceable penalty provision. We disagree.

Prior to 1977, contractual provisions by which damages for breach of contract were determined in anticipation of breach were enforceable only if it were impracticable or extremely difficult to determine actual damages. (*Ridgley v. Topa Thrift & Loan Assn.* (1998) 17 Cal.4th 970, 977 (*Ridgley*).) After its amendment in 1977, the Legislature retained the strict standard relating to such clauses in contracts for consumer goods and services or residential leases (Civ. Code, § 1671, subds. (c), (d)), but liberalized the rule as to other contracts (Civ. Code, § 1671, subd. (b)). There is no longer a presumption of invalidity.

California law currently recognizes that a provision for liquidation of damages for contractual breach, such as a preset late payment penalty, can, under some circumstances, be designed as and operate as a contractual forfeiture. (*Ridgley*, *supra*, 17 Cal.4th at pp. 976-977.) Such provisions are disfavored and a breaching party may raise an equitable defense to the payment of such sums pursuant to Civil Code section 3275. (*Ridgley,* at p. 976.)

*Ridgley* held that if the provision were fairly characterized as a prepayment charge, the clause in the contract was valid because it was a valid provision for alternative performance, an agreed form of compensation to the lender for interest lost

16

through prepayment.  (*Ridgley, supra,* 17 Cal.4th at p. 978.)  However, if viewed as a charge for late payment of interest, it would be a penalty and the charge had to meet the reasonableness standard of Civil Code section 1671.  As a preset late payment penalty, it would be deemed unreasonable, under the holding of *Garrett v. Coast & Southern Fed. Sav. & Loan Assn.* (1973) 9 Cal.3d 731.  (*Ridgley, supra,* 17 Cal.4th at p. 979.)

The question of whether the contractual clause is deemed a penalty for late payment as opposed to a prepayment charge depends on the language of the contract.  However, the inclusion of a contractual provision for acceleration of the balance of the payments due upon the borrower's default, where the parties to a note unquestionably intend that a lender can impose a prepayment charge after accelerating the obligation upon the buyer's default, the prepayment clause is applicable and enforceable.  (*Pacific Trust Co., TTEE v. Fidelity Fed. Sav. & Loan Assn.* (1986) 184 Cal.App.3d 817, 824.)

As for the assertion that the amount in question was usurious, it bears noting that a transaction not usurious at its inception cannot become usurious by virtue of the debtor's voluntary default.  (*O'Connor v. Televideo Sys.* (1990) 218 Cal.App.3d 709, 714.)  Where the excessive interest is caused by a contingency under the debtor's control, the transaction will not be deemed usurious.  (*Southwest Concrete Products v. Gosh Construction Corp.* (1990) 51 Cal.3d 701, 706.)

In the present case, the indenture provides in section 6.3 that upon an event of default, "the Note Trustee may . . . declare the principal of all Notes Outstanding,

together with the Acceleration Premium (if any) thereon, and the accrued and unpaid interest thereon, to be due and payable immediately . . . ." This constitutes an acceleration clause, rendering the entire debt due upon the occurrence of a default. It was not a forfeiture occasioned by default, but rather is a prepayment charge. It is therefore presumptively valid under Civil Code section 1671.

Invalidity of the acceleration premium was an affirmative defense asserted by the Tribe. After the Bank met its initial burden of proof, the Tribe was required "to set forth the specific facts showing that a triable issue of material fact exists as to that affirmative defense." This, the Tribe failed to do, relying, instead, on decisions interpreting the validity of penalty provisions unrelated to acceleration of the debt. The trial court properly included the acceleration premium in its calculation of damages.

### B. The Loan Documents Do Not Violate the "Sole Proprietary Interest" Rule of the Indian Gaming Regulatory Act.

The Tribe argues that the loan documents violate the "sole proprietary interest" rule under the Indian Gaming Regulatory Act (IGRA). We disagree.

IGRA was passed in 1988 in response to the United States Supreme Court decision in *California v. Cabazon Band of Mission Indians* (1987) 480 U.S. 202 [107 S.Ct.1083, 94 L.Ed.2d 244], where the high court held that the State of California and the County of Riverside could not enforce their gambling laws against the Tribe's bingo

18

enterprise.  (See *Mashantucket Pequot Tribe v. Town of Ledyard* (2d Circ. 2013) 722 F.3d 457, 469-470.)

"The purpose of the Act is  [¶]  (1) to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments;  [¶]  (2) to provide a statutory basis for the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players; and  [¶]  (3) to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming and protect such gaming as a means of generating tribal revenue."  (25 U.S.C., § 2702.)

IGRA creates a cooperative federal-state-tribal scheme for regulation of gaming by federally recognized Indian tribes on Indian land.  (*KG Urban Enterprises, LLC v. Patrick* (1st Cir. 2012) 693 F.3d 1, 7.)  It created what has become known as the "sole proprietary interest" rule by requiring the chairman of the National Indian Gaming

19

Commission (NIGC) to approve of Tribal gaming ordinances over Class II[10] gaming

activities on Indian lands if the ordinance or resolution provides that the Indian tribe will

have the sole proprietary interest and responsibility for the conduct of any gaming

activity.  (25 U.S.C., § 2710(b)(2)(A).)

Class III gaming (all forms of gambling that are not Class I or Class II, which

includes slot machines) may be licensed by NIGC if authorized by a tribal ordinance or

resolution meeting the requirements of 25 U.S.C. section 2710(b), is located in a state

that permits such gaming, and is conducted pursuant to a Tribal-State compact.  (25

U.S.C., § 2710(d)(1).)  Thus the "sole proprietary interest" rule applicable to Class II

gaming is likewise applicable to Class III gaming.

The State of California has a compact with the Tribe, permitting Class III gaming,

defined in the compact as including (a) the operation of gaming devices; (b) any banking

or percentage card game; and (c) the operation of any devices or games authorized under

state law to the California State Lottery.  (Govt. Code, § 98004, sec. 4.1, § 98006.)  Like

IGRA, the compact limits operation of gaming activities to the Tribe.

---

[10]  Class II gaming includes bingo, lotteries and certain card games in which gamblers play against each other rather than against the house, as described in 25 United States Code section 2703(7)(A).  (*Wells Fargo Bank, N.A. v. Lake of the Torches Econ. Dev. Corp.* (7th Cir. 2011) 658 F.3d 684, 687.)

It is important to note that the "sole proprietary interest" rule of IGRA speaks to gaming ordinances or resolutions adopted by a tribe; it does not necessarily speak to *contracts* entered into between a tribe and a third party. (*Guidiville Band of Pomo Indians v. NGV Gaming, LTD.* (9th Cir. 2008) 531 F.3d 767, 782-783.) However, certain contracts may come within the purview of the rule. As stated in the Federal Register, "An agreement whereby consideration is paid or payable to the gaming operation for the right to place gambling devices that are controlled by the vendor in such gaming operation is inconsistent with the requirement that a tribe have the sole proprietary interest." (58 Fed. Reg. 5804 (Jan. 22, 1993).)

Regarding collateral for loans, IGRA precludes a tribe from granting a security interest in a gaming operation if such an interest would give a party other than the tribe the right to control gaming in the event of default by a tribe. (58 Fed. Reg. 5802 (Jan. 22, 1993).) Such a security interest would be inconsistent with the IGRA's requirement that a tribe have the "sole proprietary interest and responsibility for the conduct of any gaming activity." Similarly, because IGRA specifies that a tribe (not its members) must have the sole proprietary interest, stock ownership in a tribal gaming operation by individual tribal members would also be inconsistent with IGRA. (58 Fed. Reg. 5802, 5804 (Jan. 22, 1993).)

Thus, contracts that provide for compensation totally disproportionate to services of a contractor, or give the contractor control over gaming operations casino management

21

contracts require approval by the chairman of the NIGC where the proposed manager would have control over the gaming activity in a way that implicates the sole proprietary interest rule.  (25 U.S.C., § 2710(b)(4); *Wells Fargo Bank, N.A. v. Lake of the Torches Econ. Dev. Corp.* (7th Cir. 2011) 658 F.3d 684, 698-699; see also, 1-12 Cohen's Handbook of Federal Indian Law (2015), § 12.08.)  On the other hand, a lease agreement between a tribe and a third party that does not require a tribal resolution or ordinance does not implicate the sole proprietary interest rule.  (*Guidiville Band of Pomo Indians v. NGV Gaming, LTD., supra,* 531 F.3d at pp. 782-783.)

The indenture and note between the Bank and the Tribe were secured by a perfected security interest in the DAR, after being deposited into the Tribe's custodial account with the Bank.  The indenture agreement at issue here did not confer any authority, control, or responsibility to the bondholder or the Bank for the conduct of any gaming activity.  It merely provided the Bank and the bondholder with a security interest in a specific bank account.  It did not and could not control what was deposited into that custodial account.  A contract creating a security interest in a custodial account does not convey authority or responsibility for the conduct of any gaming activity.  Therefore, it does not violate the sole proprietary interest rule.

### C.    *The Costs Award Was Appropriate.*

Because we affirm the trial court's ruling, there is no basis for reversal of the award of costs.

22

3. *The Bank's Cross-Appeal: The Trial Court Properly Granted Summary Adjudication to the Tribe and EVTDA on the Injunctive Relief Cause of Action.*

The Bank argues that the trial court erred in granting the motion for summary adjudication brought by the Tribe, EVTDA, and GTAM. The Bank's premise is that there is a triable issue of material fact as to the defendants' obligation to deposit distributions into the custodial account, and that even funds not yet distributed to the Tribe should be considered DAR based on the meaning of the term "payable" as found in its indenture agreement. It therefore argues that the trial court erred in finding the bank's note was subordinated to the bridge loan and in disregarding the Bank's right to an injunction as a secured creditor. It also argues there are triable issues of material fact as to whether GTAM has a "lien" in distributions that have been made to the Tribe's in violation of the bridge loan. We disagree.

A. *The Bank Does Not Have Standing to Compel EVTDA to Deposit Revenues Into the Tribe's Custodial Account Where EVTDA's Creditors Have Imposed a Trust on Them.*

The Tribe's indenture and note with the Bank, as well as EVTDA's bridge loan, were mutually exclusive: EVTDA borrowed money under the bridge loan, while the Tribe borrowed from the Bank under the indenture. In its tentative ruling, the trial court found there is no dispute that the bridge loan prohibited distributions to the Tribe when the bridge loan is in default and the Bank had acknowledged as much. It went on to

23

conclude that funds distributed by the EVTDA in contravention of the senior bridge loan are not DARs and do not become subject to seizure by the junior trustee or note-holder (the Bank and GTAM) because they were not "payable" (or "distributable") in the first instance under the bridge loan.

At the hearing, the trial court emphasized that the Bank was not a party to the bridge loan and lacked standing to object to what EVTDA did. The Bank argued that even if GTAM waived their right to be paid under the bridge loan, the monies would still have to be deposited into the custodial account, and then, under the indenture agreement, the Bank would be entitled to it. But nowhere in the record is there to be found an agreement between EVTDA and the Bank, binding EVTDA to deposit money into the custodial account.

1.    *Revenue That Has Not Actually Been Distributed to the Tribe Does Not Constitute DAR.*

The Bank argues that the trial court erred in granting summary adjudication on the injunctive relief cause of action because a triable issue of material fact exists as to the Tribe's and EVTDA's duties to deposit distributions. The Bank challenges the trial court's determination that distributions were not payable when prohibited by the terms of the bridge loan. The Bank considers that any revenue received by EVTDA from the resort and casino are immediately payable to the Tribe, so that the Bank's security interest extends beyond the custodial account to the pre-distributed revenue held by

24

EVTDA, over which the bridge lenders have a secured interest.  Ultimately, the Bank argues that the term "payable" is ambiguous, and that its definition, not contained in any of the indenture documents, should have been adopted.  We disagree.

An ambiguity arises when language is susceptible to more than one application to material facts.  (*Alameda County Flood Control & Water Conservation Dist.* (2013) 213 Cal.App.4th 1163, 1179.)  However, an ambiguity cannot be created by parsing words outside their context.  (*Ibid.*)  "'"[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract."'"  (*Id.* at p. 1179, citing *Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 867, italics omitted.)

Where the only evidence relating to the parties' understanding of the meaning of the term is contained in the loan documents themselves, the interpretation of the contract is a question of law for the trial court and for this court.  (*Oceanside 84, Ltd. v. Fidelity Federal Bank* (1997) 56 Cal.App.4th 1441, 1447-1448.)  When a dispute arises over the meaning of contract language, the first question to be decided is whether the language is "reasonably susceptible" to the interpretation urged by the party; if not, the case is over.  (*Id.* at p. 1448, citing *Consolidated World Investments, Inc. v. Lido Preferred, Ltd.* (1992) 9 Cal.App.4th 373, 379.)  If the term is reasonably susceptible to the interpretation urged, the court moves on to the second question:  what did the parties intend the language to mean?  (*Oceanside, supra,* 56 Cal.App.4th at p. 1448.)

25

The Bank argued in the lower court as well as in this court that the term "payable" was ambiguous. The trial court made no determination whether or not the term was ambiguous, but instead noted that section two of the amended pledge agreement provided for deposit of DARs into the custodial account on a monthly basis in an amount equal to the "Permitted Aggregate Monthly Distribution." It went to say that "Permitted Aggregate Monthly Distribution ("PAMD") means 'the aggregate amount (other than any reimbursement payment) permitted to be distributed by the Authority to the Tribe on a monthly basis in accordance with the terms and provisions of the Bridge Loan Agreement[.]' . . . Because the amount of the PAMD under the Bridge Loan is zero post-default, the Pledge Agreement itself confirms that distributions from the EVTDA to the Tribe are not 'payable' when they are prohibited under the Bridge Loan."

We agree with the trial court's findings and interpretation. The trial court did not find the terms of the agreement to be uncertain, and the record supports this interpretation. The Bank's proposed interpretation is unreasonable.

The indenture agreement between the Bank and the Tribe provided a security interest in favor of the Bank in the custodial account at the Bank, into which "Distributable Authority Revenues" would be deposited. No security interest in any of EVTDA's accounts was established, and the Bank failed to present evidence that the Tribe had the authority to grant security in accounts owned and controlled by EVTDA, as to which GTAM had a prior secured interest.

26

Additionally, the supplemental indenture defines that key term: "'Distributable Authority Revenues' means all of the gross revenues, receipts, distributions, dividends, income and other amounts payable to the Tribe from the East Valley Authority [*sic*], other than any Reimbursement Payment. The Distributable Authority Revenues include all moneys deposited by the East Valley Authority in the Custodial Account." For the definition of "Custodial Account," the indenture refers to the pledge agreement. "Reimbursement Payment" is defined as "any payment by the East Valley Authority to the Tribe constituting payment for actual services, products or benefits rendered, performed or delivered by the Tribe pursuant to the terms and conditions of the Shared Services Agreement."

The restated Pledge and Transfer Agreement, in its definitions, provides "'*Distributable Authority Revenues*' means all of the gross revenues, receipts, distributions, dividends, income and other amounts payable to the Tribe from the Authority, other than any Reimbursement Payment. The Distributable Authority Revenues include all moneys deposited by the Authority, at the direction of the Tribe, in the Custodial Account." "'*Custodial Account*' means that certain deposit account maintained by the Tribe with the Custodian and known as Custodial Account Number 15544500."

The same definitions of those terms are included in the collateral description attached to the UCC financing statement, filed with respect to the first supplemental trust

27

indenture. Plainly, the only security for the loan was the custodial account at the Bank. The Bank had no indenture agreement with the EVTDA or any security interest in the accounts of EVTDA. By the terms of the indenture and pledge agreements, DARs did not become DARs *until* the revenues were deposited into the custodial account. At that point, and not before, would the revenues become "payable" to the Bank.

Therefore, once defendants met their burden of producing evidence, the burden of production shifted to plaintiff to raise a triable issue of material fact on the matter of the interpretation of the term "payable." (Code of Civ. Proc., § 437c, subd. (p)(2); *Acosta v. Glenfed Development Corp., supra,* 128 Cal.App.4th at p. 1293.) However, the Bank merely proffered an unreasonable interpretation without introducing evidence to support the application of that interpretation.

In this respect, the Bank cited a statement by the Tribe's finance director that he was unaware of any documents that would call into question the statements that "'[a]ll cash distribution from the EVTDA are required first to pay debt service, before distribution to' Cabazon." The Bank suggests that this statement is true only if the distributions are DARs. The Bank's interpretation of this statement does not establish that funds held by EVTDA in EVTDA accounts over which the bridge lenders had a perfected security interest, constitute DARs. To establish that, the Bank would have needed to present evidence supporting the existence of a security interest in the revenues held by EVTDA.

28

Security interests are commonly evidenced by UCC financing statements, which give notice to and assures priority over interested third parties. (See *Oxford Street Properties, LLC v. Rehabilitation Associates* (2012) 206 Cal.App.4th 296, 308.) A security interest cannot exist without an underlying obligation. Although no special form is necessary to create a security interest, for a bank to stand in the position of a secured party, there must be a written agreement signed by the debtor, which creates or provides for a security interest and which contains a description of the collateral. (*Komas v. Future Systems, Inc.* (1977) 71 Cal.App.3d 809, 813; *Nunnemaker Transp. Co. v. United Cal. Bank* (9th Cir. 1972) 456 F.2d 28, 31-32.) The UCC financing statement filed in connection with Bank's security interest in the Tribe's custodial account does not refer to any accounts held by EVTDA, so no security interest in EVTDA's accounts was created by the indenture or related documents.

The Bank is the drafter of the indenture documents, requiring us to interpret them most strongly against the Bank, the party who caused any alleged uncertainty. The Bank failed to show that the term "payable" referred to revenues that have not yet been deposited into the custodial account of the Tribe.

> 2.     *There Is No Triable Issue of Material Fact Relating to Cabazon's Obligation to Deposit Funds in the Custodial Account.*

The Bank argues, alternatively, that the Tribe had an obligation to deposit "distributions" into the custodial account, independent of EVTDA's obligation under the amended pledge agreement. We disagree.

The Bank's argument is defeated by the language of the covenant it cites in support of the proposition. Section 8.7(ii) of the first supplemental trust indenture states: "So long as the Notes are Outstanding, subject to Section 8.13 hereof, the Tribe shall deposit or cause to be deposited all of the **Distributable Authority Revenues** into the Custodial Account promptly **after** receipt thereof." The plain language of the agreement obligates the Tribe to deposit *DARs*, not just any funds or revenues, into the custodial account *after* receipt from EVTDA. There is nothing in the agreement compelling the Tribe—or, much less, EVTDA—to deposit non-DAR funds into the custodial account.

3.      *The Trial Court Properly Found that the Bank's Interpretation of EVTDA's Duty to Deposit Funds into the Tribe's Custodial Account Would Subordinate the Bridge Loan to the Loan from the Bank to the Tribe.*

The Bank argues that the trial court erred in finding that its theory that EVTDA was obligated—and could therefore be compelled—to make deposits into the Tribe's custodial account would have the effect of subordinating the bridge loan to the Bank's interest. We disagree.

30

"Other things being equal, different liens upon the same property have priority according to the time of their creation, except in cases of bottomry and respondentia."[11] (Civ. Code, § 2897.) A security interest in a deposit account may be perfected only by control under California's Uniform Commercial Code, section 9314. (U.C.C., § 9312; *Full Throttle Films, Inc. v. National Mobile Television, Inc.* (2009) 180 Cal.App.4th 1438, 1442.) A security interest in deposit accounts may be perfected by control of the collateral. (U.C.C., § 9314.) The Bank had no loan agreement or indenture with EVTDA, and had no control over the deposit accounts of EVTDA. It thus had no security interest in any revenue, precluding it from compelling EVTDA to do anything with its revenues.

The Bank failed to produce evidence of a security agreement between itself and EVTDA, such as would create a security interest in favor of the Bank in EVTDA's accounts. EVTDA does have a deposit account control agreement, dated September 6, 2007, with Pacific Western Bank and Merrill Lynch on behalf of certain secured parties (GTAM). This control agreement perfected a security interest respecting EVTDA's deposit accounts and other personal or investment property, created by agreement as of August 6, 2007, between EVTDA, the Tribe, and Merrill Lynch (as agent for GTAM).

---

[11] In maritime law, "bottomry" refers to the hypothecation of a ship, while "respondentia" refers to the hypothecation of the cargo or goods on the ship.

31

The Bank was not mentioned in the agreement, so it had no security interest in EVTDA's deposit accounts.

The bridge loan and its account control agreement conferred priority to the bridge lenders, secured by the deposit accounts held by EVTDA. To grant the Bank the right to control EVTDA's account, or to compel it to deposit funds into the Tribe's custodial account, would effectively subordinate the secured interests of the bridge lenders, as the trial court correctly found.

> B.     *The Trial Court Properly Granted Attorneys' Fees to EVTDA and*
> *Denied Them for the Bank.*

The Bank sought attorneys' fees in the trial court pursuant to Civil Code section 1717, in addition to costs, as against the Tribe. The trial court awarded Bank costs, but denied its motion for attorneys' fees. The trial court's reasoning was that the Bank, notwithstanding the judgment on the contract claim awarding it in excess of $65 million, was not the prevailing party. The lower court reasoned that the Bank did not achieve its objective of compelling EVTDA to deposit revenues into the custodial account by way of the second cause of action, which was its primary objective. The trial court noted that there never was a real dispute about the Tribe's indebtedness under the indenture agreement. Instead, the objective of the litigation was for the Bank to obtain a judgment that EVTDA had to pay the Bank before making distributions to the Tribe, and the Tribe and EVTDA prevailed on that claim. We agree.

Civil Code section 1717 provides that costs shall be awarded in an action on a contract to the party determined to be the party prevailing on the contract. Where neither party achieves complete victory on all contract claims, Civil Code section 1717 expressly contemplates some sort of comparison of respective results by providing for the award to the party obtaining "a greater relief." (*De la Cuesta v. Benham* (2011) 193 Cal.App.4th 1287, 1295.) In determining litigation success, courts should respect substance rather than form, and should be guided by equitable considerations. (*Ibid.*) In such situations, it is within the discretion of the trial court to determine which party prevailed on the contract, or whether, on balance, neither party prevailed sufficiently to justify an award of attorney fees. (*Scott Co. v. Blount, Inc.* (1999) 20 Cal.4th 1103, 1109.) The trial court's determination that the Bank did not prevail on the contract was an exercise of discretion. (*Hilltop Investment Associates v. Leon* (1994) 28 Cal.App.4th 462, 466.)

In deciding whether there is a party prevailing on the contract, the trial court is to compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources. (*Hsu v. Abarra* (1995) 9 Cal.4th 863, 875.) In other words, "[t]he prevailing party determination is to be made only upon final resolution of the contract claims and only by 'a comparison of the extent to which each party ha[s] succeeded and failed to succeed in its contentions.'" (*Id.* at p. 876, quoting *Bank of Idaho v. Pine Avenue Associates* (1982) 137 Cal.App.3d 5, 15.)

33

Here, the Bank sued the Tribe for breach of contract, but sued both Tribe and EVTDA for injunctive relief, relating to the contract breach. The Bank's primary litigation objective was to obtain access to funds of EVTDA via injunctive relief, with which to obtain compensation owed by the Tribe. Both EVTDA and the Tribe attempted to work with all their creditors to work out a restructuring of their respective indebtedness. While EVTDA's creditors were willing to do so, the Bank refused, choosing to sue both defendants in order to improve its position of priority by obtaining a judgment creating a lien against EVTDA's accounts. Despite the judgment on the breach of contract claim, the Bank's attempt to obtain priority over EVTDA's secured creditors left it in no better position than it occupied before filing the lawsuit respecting its ability to obtain compensation for the breach of contract.

As to the Tribe, as the trial court noted, there was never a dispute that it was indebted to the Bank under the indenture and related documents. Obtaining a judgment that the Bank was entitled to compensation from the Tribe under its contract did not improve its chances of recovering losses due to the Tribe's default. The Bank's security was in a custodial account into which no revenues were deposited from and after April 2012. Without legal means to compel EVTDA to deposit such funds into the Tribe's custodial account, the Bank's judgment was a rather hollow victory. Thus, despite the money judgment against the Tribe in excess of $65 million, the Bank obtained no

34

judgment at all against EVTDA, and thus did not succeed in its primary litigation objective.

The trial court did not abuse its discretion in finding that the Bank did not prevail on the breach of contract claim, notwithstanding the judgment.

## DISPOSITION

The judgment is affirmed. Each party to bear its own costs.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ\
P. J.

We concur:

McKINSTER\
J.

MILLER\
J.

35